# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

IN RE: JUROR QUESTIONNAIRES IN
UNITED STATES V. STONE

    MICHAEL CERNOVICH,

                  Petitioner,

      v.

UNITED STATES OF AMERICA, ROGER
JASON STONE, JR.,

               Respondents.

**Case No. 20-mc-00016-ABJ**

## BRIEF OF THE REPORTERS COMMITTEE FOR FREEDOM OF THE PRESS AND 21 MEDIA ORGANIZATIONS AS AMICI CURIAE IN SUPPORT OF MOTION FOR ACCESS TO JURY QUESTIONNAIRES

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Local Civil Rule 7(o)(5) and Federal Rule of Appellate Procedure 29(a)(4)(A), the Reporters Committee for Freedom of the Press certifies that it is an unincorporated association of reporters and editors with no parent corporation and no stock.

The Associated Press is a global news agency organized as a mutual news cooperative under the New York Not-For-Profit Corporation law.  It is not publicly traded.

BuzzFeed Inc. is a privately-owned company, and National Broadcasting Company (NBC) owns ten percent or more of its stock.

Courthouse News Service is a privately held corporation with no parent corporation, and no publicly held corporation holds more than ten percent of its stock.

The E.W. Scripps Company is a publicly traded company with no parent company.  No individual stockholder owns more than ten percent of its stock.

Fox Television Stations, LLC (FTS) is an indirect subsidiary of Fox Corporation, a publicly held company.  No other publicly held company owns ten percent or more of the stock of Fox Corporation.

Gannett Co., Inc. is a publicly traded company and has no affiliates or subsidiaries that are publicly owned.  BlackRock, Inc. and the Vanguard Group, Inc. each own ten percent or more of the stock of Gannett Co., Inc.

The International Documentary Association is a not-for-profit organization with no parent corporation and no stock.

The Investigative Reporting Workshop is a privately funded, nonprofit news organization based at the American University School of Communication in Washington.  It issues no stock.

The Media Institute is a 501(c)(3) non-stock corporation with no parent corporation.

MediaNews Group Inc. is a privately held company.  No publicly held company owns ten percent or more of its equity interests.

MPA - The Association of Magazine Media has no parent companies, and no publicly held company owns more than ten percent of its stock.

National Press Photographers Association is a 501(c)(6) nonprofit organization with no parent company.  It issues no stock and does not own any of the parties' or amici's stock.

The New York Times Company is a publicly traded company and has no affiliates or subsidiaries that are publicly owned.  No publicly held company owns ten percent or more of its stock.

The News Leaders Association has no parent corporation and does not issue any stock.

POLITICO LLC's parent corporation is Capitol News Company.  No publicly held corporation owns ten percent or more of POLITICO LLC's stock.

Radio Television Digital News Association is a nonprofit organization that has no parent company and issues no stock.

Reveal from The Center for Investigative Reporting is a California non-profit public benefit corporation that is tax-exempt under section 501(c)(3) of the Internal Revenue Code.  It has no statutory members and no stock.

The Society of Environmental Journalists is a 501(c)(3) non-profit educational organization.  It has no parent corporation and issues no stock.

Society of Professional Journalists is a non-stock corporation with no parent company.

The Tully Center for Free Speech is a subsidiary of Syracuse University.

WP Company LLC d/b/a The Washington Post is a wholly owned subsidiary of Nash Holdings LLC, a holding company owned by Jeffrey P. Bezos.  WP Company LLC and Nash Holdings LLC are both privately held companies with no securities in the hands of the public.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..........................................................................................II

INTEREST OF AMICI CURIAE.............................................................................. 1

INTRODUCTION ...................................................................................................... 2

ARGUMENT .............................................................................................................. 3

I.      Members of the press, like amici, contribute to public understanding of the criminal
        justice system and promote the administration of justice by reporting on jury selection... 3
II.     The First Amendment ensures a presumptive right of access to voir dire that includes
        access to jury questionnaires.................................................................................... 5
III.    This presumptive right of access includes the right to know which questionnaires
        correspond to those jurors selected for service. .................................................. 9
IV.     The public's right of access to voir dire applies to the jury questionnaires and
        corresponding jury identification numbers in this case. .................................................... 10

CONCLUSION.......................................................................................................... 13

# TABLE OF AUTHORITIES

**CASES**

*Batson v. Kentucky*, 476 U.S. 79 (1986) (Marshall, J., concurring) ................................................ 3

*\*Cable News Network, Inc. v. United States*, 824 F.2d 1046 (D.C. Cir. 1987) .................. 7, 8, 11

*Copley Press, Inc. v. San Diego Superior Court*, 228 Cal. App. 3d 77 (1991) ........................... 6

*Forum Commc'ns Co. v. Paulson*, 752 N.W.2d 177 (N.D. 2008) ................................................. 6

*In re Globe Newspaper Co.*, 920 F.2d 88 (1st Cir. 1990) ................................................. 5, 6, 9, 11

*In re Grand Jury Subpoena, Judith Miller*, 493 F.3d 152 (D.C. Cir. 2007) ............................... 11

*\*In re Jury Questionnaires*, 37 A.3d 879 (D.C. 2012) ......................................................... *passim*

*\*In re Wash. Post*, Misc. No. 92-301, 1992 WL 233354 (D.D.C. July 23, 1992) ............... *passim*

*Ohio ex rel. Beacon Journal Publ'g Co. v. Bond*, 781 N.E.2d 180 (Ohio 2002) ...................... 6, 9

*\*Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984) ........................................... *passim*

*Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980) ....................................................... 5

*Sheppard v. Maxwell*, 384 U.S. 333 (1966) ................................................................................ 12

*Stephens Media, LLC v. Eighth Judicial District Court*, 221 P.3d 1240 (Nev. 2009) .............. 6, 9

*United States v. Blagojevich*, 612 F.3d 558 (7th Cir. 2010) ............................................... 5, 9, 11

*United States v. Bonds*, No. C 07-00732 SI, 2011 WL 902207 (N.D. Cal. Mar. 14, 2011) ....... 6, 9

*United States v. McDade*, 929 F. Supp. 815 (E.D. Pa. 1996) ...................................................... 6

*United States v. Warner*, 498 F.3d 666 (7th Cir. 2007) (Kanne, J., dissenting) ........................... 4

*United States v. Wecht*, 537 F.3d 222 (3d Cir. 2008) ................................................................ 11

*Wash. Post v. Robinson*, 935 F.2d 282 (D.C. Cir. 1991) ........................................................... 11


**STATUTES**

Jury Selection and Service Act, 28 U.S.C. § 1861, *et seq.* ......................................................... 11


**OTHER AUTHORITIES**

Annie Sweeney & Jason Meisner, *Juror in Cellini trial appears to have hidden two felony
    convictions, Tribune finds*, Chicago Tribune (Nov. 11, 2011) .................................................. 4

Darren Samuelsohn & Josh Gerstein, *Federal judge rebukes Trump over Roger Stone jury
    comments*, POLITICO (Feb. 25, 2020) .................................................................................. 12

Rob Wildeboer, *Cellini juror lies not enough to overturn conviction*, WBEZ.org
    (Jan. 24, 2012) ........................................................................................................................ 4

Spencer Hsu & Matt Zapotosky, *Trump calls Stone juror 'totally biased' while prosecutors,
    defense attorneys are debating new trial*, Wash. Post (Feb. 25, 2020) ............................ 11, 12

Steve McGonigle & Ed Timms, *Race Bias Pervades Jury Selection*, Dallas Morning News,
    Mar. 9, 1986, 1986 WLNR 1683009 ........................................................................................ 3


**RULES**

Local Civil Rule 7 ......................................................................................................................... 1

## INTEREST OF AMICI CURIAE

Amici curiae are: the Reporters Committee for Freedom of the Press ("Reporters Committee"), The Associated Press, BuzzFeed, Courthouse News Service, The E.W. Scripps Company, Fox Television Stations, LLC, Gannett Co., Inc., International Documentary Assn., Investigative Reporting Workshop at American University, The Media Institute, MediaNews Group Inc., MPA - The Association of Magazine Media, National Press Photographers Association, The New York Times Company, The News Leaders Association, POLITICO LLC, Radio Television Digital News Association, Reveal from The Center for Investigative Reporting, Society of Environmental Journalists, Society of Professional Journalists, Tully Center for Free Speech, and The Washington Post (collectively, "amici").[1] Amici respectfully submit this amici brief pursuant to Local Civil Rule 7(o).

Lead amicus the Reporters Committee is an unincorporated nonprofit association.  The Reporters Committee was founded by leading journalists and media lawyers in 1970, when the nation's news media faced an unprecedented wave of government subpoenas, forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment freedoms and the newsgathering rights of journalists.[2]

As news outlets and organizations devoted to defending First Amendment freedoms, including the rights of journalists and media organizations to gather and report the news, amici have a powerful interest in ensuring that the public and press are able to access court proceedings

---

[1]     No counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief.  No person other than amici curiae or its counsel made a monetary contribution to the preparation or submission of this brief.

[2]     Descriptions of each of the other amici are included below in Appendix A.

and records and fulfill their oversight role as a check on the functioning of the criminal justice system.  Juries play a critical role in criminal trials, and the public has a strong interest in understanding and monitoring the jury selection process.  The news media rely on access to both in-person voir dire and written jury questionnaires to inform the public about this process.  Accordingly, while any member of the public can seek access to these jury questionnaires, amici are uniquely positioned to provide the Court with information and insight based on their experience advocating on behalf of access for the news media and public.

## INTRODUCTION

The issue before the Court is whether—after a jury has rendered its verdict and been dismissed—the Court should make publicly available sealed jury questionnaires and do so in a manner that enables the public to ascertain how, in particular, the jury's foreperson responded.

The U.S. Supreme Court has established that the press and public enjoy a presumptive First Amendment right of access to voir dire.  *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 510–11 (1984) ("*Press-Enterprise I*").  Because courts frequently employ written jury questionnaires as a substitute for oral questioning, every court that has confronted the issue has ruled that the presumptive First Amendment right of access to voir dire extends to such questionnaires.  The right to know which questionnaires belong to those jurors ultimately empaneled for trial is implied or assumed without discussion in much of the case law, and logically follows from the fact that the information contained in the questionnaires would have been discussed in open court, but for the use of a written document for efficiency purposes.

The public has a particularly powerful interest in this high-profile case.  That the jury foreperson identified herself publicly, and the defendant and President then attacked her impartiality and veracity during voir dire only strengthens—not weakens—the public's already

significant interest in reviewing the jury questionnaires for itself.  Simply put, public access to the jury questionnaires will promote trust in the criminal justice system by allowing members of the press and public to better understand how the jury in this case was selected.  At the same time, applying the *Press-Enterprise I* framework here, as the First Amendment requires, would still enable the Court to protect juror safety and privacy, as appropriate.

For these reasons, amici respectfully urge the Court to grant public access to the jury questionnaires and to the jury identification number of the foreperson, which would presumably allow her questionnaire to be identified.

## ARGUMENT

### I.     Members of the press, like amici, contribute to public understanding of the criminal justice system and promote the administration of justice by reporting on jury selection.

Media access to voir dire, including jury questionnaires, routinely helps to inform the public about court proceedings and ensure the proper functioning of the criminal justice system. For example, in 1986, reporters at the *Dallas Morning News* examined thousands of jury selection records and concluded that prosecutors in Dallas County had used peremptory or discretionary strikes to exclude almost 90 percent of eligible black panel members from jury service.  Steve McGonigle & Ed Timms, *Race Bias Pervades Jury Selection*, Dallas Morning News, Mar. 9, 1986, at 1, 29, 1986 WLNR 1683009.  The report also found that "the chance of a qualified black [person] serving on a jury was 1-in-10, compared to a 1-in-2 chance for a qualified white" person.  *Id.*  Justice Marshall cited this reporting in *Batson v. Kentucky*, the seminal case that held, on equal protection grounds, that peremptory challenges could not be used in a racially discriminatory manner.  476 U.S. 79, 104 & n.4 (1986) (Marshall, J., concurring) (citing McGonigle & Timms, *supra*).

More recently, the *Chicago Tribune* discovered "major inconsistencies between answers in a jury questionnaire and public records" in the criminal prosecution of former Illinois governor George H. Ryan, Sr.  *United States v. Warner*, 498 F.3d 666, 705 (7th Cir. 2007) (Kanne, J., dissenting).  Specifically, one juror had not disclosed two criminal convictions, and another failed to disclose several criminal arrests, as well as the fact that she had given law enforcement false information when she was booked.  *Id.* at 676.  Based on the *Tribune* report, the district judge halted jury deliberations and requested that the U.S. Attorney's Office conduct a background check on all jurors.  *Id*. at 705.  Ultimately, two jurors "who provided untruthful answers were excused from further service . . . ."  *Id.* at 706.  Without the *Tribune's* reporting, a verdict likely would have been rendered by jurors that were later found unfit for service.  Access to jury questionnaires enabled the court to avoid the need for a new trial.

In 2011, the *Tribune* again uncovered omissions on jury questionnaires, this time related to the prosecution of William Cellini, a co-defendant in the case against former Illinois governor Rod Blagojevich.  *See* Annie Sweeney & Jason Meisner, *Juror in Cellini trial appears to have hidden two felony convictions, Tribune finds*, Chicago Tribune (Nov. 11, 2011), https://www.chicagotribune.com/news/ct-xpm-2011-11-11-ct-met-cellini-jury-20111111-story.html.  One juror failed to disclose two felony convictions on her questionnaire.  *Id.*  The district court later ruled that the omissions were "understandable, honest and inadvertent errors," and that the juror had not been biased against the defendant.  *See* Rob Wildeboer, *Cellini juror lies not enough to overturn conviction*, WBEZ.org (Jan. 24, 2012), http://perma.cc/RQC5-WXYY.  Although the juror was not excused, and the verdict not overturned, the *Tribune's* reporting helped the court to function properly by providing relevant information that enabled the district judge to make an appropriate ruling on the issue in a timely manner.

4

These are just a handful of the many examples of media reporting that reaffirm the benefits—to the public and to the proper functioning of the judicial system—of public access to jury questionnaires.

## II.     The First Amendment ensures a presumptive right of access to voir dire that includes access to jury questionnaires.

Openness is a hallmark of our criminal justice system because it gives "assurance that the proceedings [are] conducted fairly to all concerned, and it discourage[s] perjury, the misconduct of participants, and decisions based on secret bias or partiality." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569 (1980).  The U.S. Supreme Court has held that this constitutional right of access applies to voir dire, acknowledging that the jury selection process "is itself a matter of importance, not simply to the adversaries but to the criminal justice system."  *Press-Enterprise I*, 464 U.S. at 506, 510–11.  As the Supreme Court has explained:

> The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known. Openness thus enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system.

*Id*. at 508 (emphasis in original).

These principles are particularly apt in the context of jury selection, where openness "allows the public to verify the impartiality of key participants in the administration of justice." *In re Globe Newspaper Co*., 920 F.2d 88, 94 (1st Cir. 1990).  Indeed, "the public-at-large has a valid interest in 'learning whether the seated jurors are suitable decision-makers.'"  *In re Jury Questionnaires*, 37 A.3d 879, 885 (D.C. 2012) (quoting *United States v. Blagojevich*, 612 F.3d 558, 561 (7th Cir. 2010)) (internal brackets omitted).  Public dissemination of information from the jury selection process "serves to educate the public regarding the judicial system and can be

important to public debate about its strengths, flaws and means to improve it." *In re Globe Newspaper Co.*, 920 F.3d at 94.

Courts overwhelmingly recognize that written jury questionnaires are a mere substitute for oral questioning during the jury selection process and that questionnaires help to conserve judicial resources by expediting voir dire and reducing the need for lengthy, in-court testimony by prospective jurors. *See, e.g.*, *In re Jury Questionnaires*, 37 A.3d at 885–86 ("We can think of no principled reason to distinguish written questions from oral questions for purposes of the First Amendment right of public access."); *Ohio ex rel. Beacon Journal Publ'g Co. v. Bond*, 781 N.E.2d 180, 188 (Ohio 2002) (explaining that "the purpose behind juror questionnaires is merely to expedite the examination of prospective jurors").

Accordingly, federal and state courts are in widespread agreement that juror questionnaires are subject to the same First Amendment presumption of openness that attaches to voir dire generally. *See In re Jury Questionnaires*, 37 A.3d at 886 ("Every court that has decided the issue has treated jury questionnaires as part of the *voir dire* process and thus subject to the presumption of public access.") (collecting cases); *see also Stephens Media, LLC v. Eighth Judicial District Court*, 221 P.3d 1240, 1245 (Nev. 2009); *Forum Commc'ns Co. v. Paulson*, 752 N.W.2d 177, 182–83 (N.D. 2008); *Beacon Journal*, 781 N.E.2d at 187–89; *United States v. Bonds*, No. C 07-00732 SI, 2011 WL 902207, at *3 (N.D. Cal. Mar. 14, 2011); *United States v. McDade*, 929 F. Supp. 815, 817 n.4 (E.D. Pa. 1996); *In re Wash. Post*, Misc. No. 92-301, 1992 WL 233354, at *2 (D.D.C. July 23, 1992); *Copley Press, Inc. v. San Diego Superior Court*, 228 Cal. App. 3d 77, 89 (1991).

Where, as here, the presumption of access applies, the Supreme Court has held that it "may be overcome only by an overriding interest based on findings that closure is essential to

preserve higher values and is narrowly tailored to serve that interest." *Press-Enterprise I*, 464

U.S. at 510. The D.C. Circuit has explained that, in the context of voir dire, this analysis

requires trial courts to do three things:

> First, trial courts must make findings that an open *voir dire*
> proceeding threatens either the defendant's Sixth Amendment right
> to a fair trial or a prospective juror's privacy interests.
>
> Second, in order to "minimize the risk of unnecessary closure" trial
> courts should require prospective jurors to make "affirmative
> request[s]" for private *voir dire* examination.
>
> Finally, trial courts must consider whether alternatives to closure are
> available that will adequately protect the interests of prospective
> jurors.

*Cable News Network, Inc. v. United States*, 824 F.2d 1046, 1048 (D.C. Cir. 1987) (citing *Press-*

*Enterprise I*, 464 U.S. at 511–12) (hereinafter "*Cable News Network*").

In *Cable News Network*, the trial court attempted to conduct voir dire of prospective

jurors *in camera*, save for a handful of jurors who elected to be questioned in open court. *Id.* at

1047. At the same time, the trial court ruled that transcripts of the examinations and the

completed jury questionnaires "would be made public as soon as possible, with redactions

limited to those matters that the judge specifically found entitled to protection from public

disclosure and dissemination." *Id.* The D.C. Circuit summarily reversed, explaining that the

trial court had "fail[ed] to meet any of the three conditions articulated in *Press-Enterprise* for

closure of *voir dire*." *Id.* at 1048.

The D.C. Circuit held that, first, the trial court had failed to make specific findings "that

public interrogation of any individual member of the *voir dire* would 'touch on deeply personal

matters that the juror has legitimate reasons for keeping out of the public domain'" and that

"outweighed the value to the public of an open *voir dire*." *Id.* at 1048–49 (quoting *Press-*

*Enterprise I*, 464 U.S. at 511) (internal brackets omitted).  Second, the trial court had not

required the jurors, "as *Press-Enterprise* demands," to make an "affirmative request" for an *in

camera* voir dire interview, instead flipping this requirement "on its head by permitting

prospective jurors to elect closed *voir dire* simply by remaining mute." *Id.* at 1049.  Finally, the

trial court had failed to consider alternatives to closure—such as by conducting voir dire in open

court while "responding to individual expressions of specific concern over particular questions

by permitting interrogation *in camera* where warranted under prevailing law." *Id.*

    The D.C. Circuit's decision in *Cable News Network* applies fully to jury questionnaires,

like those at issue here.  *See In re Wash. Post*, 1992 WL 233354 at *3–4.  In *In re Washington

Post*, for example, Judge Lamberth applied this framework and granted a news media request to

unseal jury questionnaires with certain limited redactions.  *Id.* at *4.  Judge Lamberth stressed

that the redacted information "touches on deeply personal matters that prospective jurors have a

legitimate interest in keeping out of the public domain" and therefore necessitated sealing.  *Id.*

("The information that shall be redacted is as personal to the prospective jurors in this case as the

rape example[3] that the Supreme Court provided in *Press–Enterprise*.  Just as in that example,

disclosure . . . would lead to public embarrassment and emotional trauma to the prospective

jurors, their families and close friends.").

---

[3]    In *Press-Enterprise I*, the Court acknowledged that a prospective juror may sometimes
have a compelling interest in privacy, such as if—in a case involving allegations of rape—a
prospective juror "might privately inform the judge that she, or a member of her family, had been
raped but had declined to seek prosecution because of the embarrassment and emotional trauma
from the very disclosure of the episode."  464 U.S. at 512.  The Court explained that in these
circumstances, the juror's interest in privacy "must be balanced against the historic values . . .
and need for openness of the process."  *Id.*

**III.    This presumptive right of access includes the right to know which questionnaires correspond to those jurors selected for service.**

*Press-Enterprise I* is clear that the presumptive right of access applies to voir dire, and voir dire has traditionally involved prospective jurors answering questions in open court.  464 U.S. at 508–09.  Because the public can observe which juror answers which questions when voir dire is conducted in open court, courts have implied or assumed without discussion that the public's right of access to voir dire requires that questionnaires be released in a manner that enables the public to match them to individual jurors.  *See, e.g.*, *In re Wash. Post*, 1992 WL 233354, at *4 n.2 (adopting news outlet's position that if redaction "is deemed necessary," that "the name of the juror be left and disclosed," and "that the redaction . . . be limited to that portion of the questionnaire that dealt with the information that the Court felt should be private"); *Bonds*, 2011 WL 902207, at *4 (ordering disclosure of numbered questionnaires so the press and public "have open and meaningful access" to voir dire, "just as they would have had access to the questions and answers if the Court had conducted an extended oral voir dire"); *Stephens Media*, 221 P.3d at 1255 (ordering district court to release "all unredacted completed juror questionnaires"); *In re Jury Questionnaires*, 37 A.3d at 883, 885, 889 (recognizing public's interest in learning whether "seated jurors are suitable decision-makers" and remanding to trial court to apply presumption of access to questionnaires that identified jurors by number without discussion of redacting the numbers) (quoting *Blagojevich*, 612 F.3d at 561); *see also Beacon Journal*, 781 N.E.2d at 196 n.9 (holding that the "nondisclosure of any name, address, or questionnaire response" must meet the *Press-Enterprise I* test); *In re Globe Newspaper*, 920 F.2d at 98 (ordering release of juror names and addresses, explaining that "the prospect of criminal justice being routinely meted out by unknown persons does not comport with democratic values of accountability and openness").

In sum, as the weight of authority makes clear, jury questionnaires should allow the public to identify a specific juror's questionnaire—whether by name or juror identification number—absent specific, on-the-record findings that redaction of the juror's identifier is essential to preserve higher values and is narrowly tailored to serve such compelling interest.

**IV.    The public's right of access to voir dire applies to the jury questionnaires and corresponding jury identification numbers in this case.**

For the reasons set forth above, the continued sealing of the jury questionnaires at issue here implicates the public's presumptive First Amendment right of access to voir dire.  Absent specific factual findings demonstrating a compelling interest requiring their continued sealing, and consideration of alternatives to such sealing, those jury questionnaires must be made public with their corresponding jury identification numbers, and the foreperson's jury identification number should be disclosed.

Had the foreperson answered oral questions during voir dire in open court, members of the press and the public would have witnessed how she answered those questions, even if they did not know her name.  To deny the public the ability to understand which questionnaire belonged to which juror is the equivalent of conducting voir dire with the jurors testifying behind a screen or of closing the courtroom during voir dire and later releasing a transcript of the proceedings that includes only the text of the prospective jurors' answers without any indication of which answers corresponded with which seated juror.  Both of these measures would infringe the constitutional right of the public to observe voir dire, unless the Court identified an overriding interest, made specific findings to justify the closure in a narrowly tailored manner, and considered alternatives.  *Cf. In re Wash. Post*, 1992 WL 233354, at *4 n.2.

Amici recognize the Court's legitimate concerns about juror privacy in this high-profile case, and the need to protect jurors' safety.  Indeed, as the Court stated at a hearing on February

25: "Any attempt to harass or intimidate jurors is completely antithetical to our system of justice."[4]  The framework identified in *Press-Enterprise I* and distilled in *Cable News Network* provide a mechanism for courts to address such concerns, permitting, for example, redaction of information that "touch[es] on deeply personal matters" that override the public's interest in openness.  824 F.2d at 1048–49 (quoting *Press-Enterprise I*, 464 U.S. at 511).  Proposed Intervenor has not sought disclosure of the names of the jurors—even though the First Amendment, common law, and Jury Selection and Service Act, 28 U.S.C. § 1861, *et seq*., establish a presumption of access to their names.[5]  And the jurors themselves have recognized such a presumption, ECF 7 at 2; at least two jurors have now identified themselves publicly,[6] indicating that at least some jurors are not insisting on remaining anonymous.

---

[4]      Spencer Hsu & Matt Zapotosky, *Trump calls Stone juror 'totally biased' while prosecutors, defense attorneys are debating new trial*, Wash. Post (Feb. 25, 2020), https://www.washingtonpost.com/local/legal-issues/roger-stone-allegation-of-juror-misconduct-and-demand-for-new-trial-to-be-heard-in-semi-public-hearing-tuesday/2020/02/25/.html.

[5]      *See, e.g.*, *Blagojevich*, 612 F.3d at 563 (recognizing presumption of access to jurors' names under "common-law tradition of open litigation" and Jury Selection and Service Act); *United States v. Wecht*, 537 F.3d 222, 239 (3d Cir. 2008) (recognizing First Amendment right of access to jurors' names); *In re Globe Newspaper Co.*, 920 F.2d at 92 (recognizing presumption of access to juror identities under Jury Selection and Service Act); § 1863 (requiring each U.S. district court to adopt a plan for jury selection that must "fix the time when the names drawn from the qualified jury wheel shall be disclosed to parties *and to the public*" and recognizing that the plan may permit judges "to keep these names confidential in any case where *the interests of justice so require*") (emphasis added); *cf. Press-Enterprise I*, 464 U.S. at 512 (acknowledging that the names of jurors are, by default, open to the public, but "a valid privacy right may rise to a level" requiring "the name of a juror [to be] withheld, to protect the person from embarrassment"); *In re Wash. Post*, 1992 WL 233354, at *4 n.2 (recognizing First Amendment right of access to jury questionnaires and intentionally releasing them with juror names).

[6]      Amici recognize the Court's legitimate concern for the safety of the jurors but also note that continued sealing of the names of those jurors who have already identified themselves would be improper, as their names are now public so there is no need for continued secrecy.  *See, e.g.*, *Wash. Post v. Robinson*, 935 F.2d 282, 292 (D.C. Cir. 1991) (finding no compelling interest to justify sealing plea agreement where an official source had already disclosed its contents); *In re Grand Jury Subpoena, Judith Miller*, 493 F.3d 152, 154–55 (D.C. Cir. 2007) (ordering release of redacted portions of documents where the "cat [was] out of the bag").

That these jurors chose to come forward and publicly express their views about the case after being discharged substantially weakens any argument for continued secrecy.  The values underlying the First Amendment right of access—in particular, "the public trial as a check on the fair functioning of the criminal justice system—are served even after the verdict is in."  *In re Jury Questionnaires*, 37 A.3d at 889.  And amici, as "surrogate[s] for the public, ha[ve] an ongoing interest in the jury selection process as a general matter of civic interest."  *Id.*

Moreover, the fact that the defendant and the President have publicly attacked the foreperson's veracity and impartiality,[7] makes transparency even more important here.  This case has understandably garnered significant public attention, as it involves the (now) conviction of a longtime friend and former campaign advisor to the President for lying to the House Intelligence Committee, tampering with a witness, and obstructing the House investigation into Russian interference in the 2016 presidential election.  ECF 260.  Public access to the foreperson's jury questionnaire and juror identification number will allow members of the public to assess for themselves the foreperson's service on the jury and, accordingly, will ultimately promote trust in the criminal justice system.  *See Sheppard v. Maxwell*, 384 U.S. 333, 349–50 (1966) (recognizing that secrecy can breed "distrust").

---

[7]    Darren Samuelsohn & Josh Gerstein, *Federal judge rebukes Trump over Roger Stone jury comments*, POLITICO (Feb. 25, 2020), https://www.politico.com/news/2020/02/25/judge-rebukes-trump-roger-stone-jury-117442; Hsu & Zapotosky, *supra* n.4.

## CONCLUSION

For the foregoing reasons, amici urge the Court to disclose the jury questionnaires in this case, including the jury identification numbers so that the public is able to identify which questionnaire belonged to the foreperson.


Dated: March 19, 2020                                Respectfully submitted,

                                                     _____/s/_____
                                                     Katie Townsend
                                                     (D.C. Bar No. 1026115)
                                                       *Counsel of Record for Amici Curiae*
                                                     Sarah Matthews*
                                                     Reporters Committee for
                                                     Freedom of the Press
                                                     1156 15th Street NW, Ste. 1020
                                                     Washington, D.C. 20005
                                                     Telephone: 202.795.9300
                                                     ktownsend@rcfp.org

                                                     *Counsel for Amici Curiae*
                                                     *Of counsel

# APPENDIX A: AMICI STATEMENTS OF INTEREST

The Associated Press ("AP") is a news cooperative organized under the Not-for-Profit Corporation Law of New York.  The AP's members and subscribers include the nation's newspapers, magazines, broadcasters, cable news services and Internet content providers.  The AP operates from 280 locations in more than 100 countries.  On any given day, AP's content can reach more than half of the world's population.

BuzzFeed is a social news and entertainment company that provides shareable breaking news, original reporting, entertainment, and video across the social web to its global audience of more than 200 million.

Courthouse News Service is a California-based legal news service that publishes a daily news website with a focus on politics and law.  The news service also publishes daily reports on new civil actions and appellate rulings in both state and federal courts throughout the nation. Subscribers to the daily reports include law firms, universities, corporations, governmental institutions, and a wide range of media including newspapers, television stations, and cable news services.

The E.W. Scripps Company serves audiences and businesses through local television, with sixty television stations in forty-two markets.  Scripps also owns Newsy, the next-generation national news network; podcast industry leader Stitcher; national broadcast networks Bounce, Grit, Escape, Laff and Court TV; and Triton, the global leader in digital audio technology and measurement services.  Scripps serves as the long-time steward of the nation's largest, most successful and longest-running educational program, the Scripps National Spelling

Bee.

Directly and through affiliated companies, Fox Television Stations, LLC, owns and operates twenty-eight local television stations throughout the United States.  The twenty-eight stations have a collective market reach of thirty-seven percent of U.S. households.  Each of the twenty-eight stations also operates Internet websites offering news and information for its local market.

Gannett is the largest local newspaper company in the United States.  Our 260 local daily brands in forty-six states and Guam—together with the iconic USA TODAY—reach an estimated digital audience of 140 million each month.

The International Documentary Association (IDA) is dedicated to building and serving the needs of a thriving documentary culture.  Through its programs, the IDA provides resources, creates community, and defends rights and freedoms for documentary artists, activists, and journalists.

The Investigative Reporting Workshop, based at the School of Communication (SOC) at American University, is a nonprofit, professional newsroom.  The Workshop publishes in-depth stories at investigativereportingworkshop.org about government and corporate accountability, ranging widely from the environment and health to national security and the economy.

The Media Institute is a nonprofit foundation specializing in communications policy issues founded in 1979.  The Media Institute exists to foster three goals: freedom of speech, a competitive media and communications industry, and excellence in journalism.  Its program agenda encompasses all sectors of the media, from print and broadcast outlets to cable, satellite, and online services.

MediaNews Group Inc. publishes the *Mercury News*, the *East Bay Times*, *St. Paul*

*Pioneer Press*, *The Denver Post*, the *Boston Herald*, the *Detroit News*, and other regional and community papers throughout the United States, as well as numerous related online news sites.

MPA – The Association of Magazine Media ("MPA") is the industry association for magazine media publishers. The MPA, established in 1919, represents the interests of close to 100 magazine media companies with more than 500 individual magazine brands. MPA's membership creates professionally researched and edited content across all print and digital media on topics that include news, culture, sports, lifestyle, and virtually every other interest, avocation or pastime enjoyed by Americans. The MPA has a long history of advocating on First Amendment issues.

The National Press Photographers Association ("NPPA") is a 501(c)(6) non-profit organization dedicated to the advancement of visual journalism in its creation, editing, and distribution. NPPA's members include television and still photographers, editors, students and representatives of businesses that serve the visual journalism industry. Since its founding in 1946, the NPPA has vigorously promoted the constitutional rights of journalists as well as freedom of the press in all its forms, especially as it relates to visual journalism. The submission of this brief was duly authorized by Mickey H. Osterreicher, its General Counsel.

The New York Times Company is the publisher of *The New York Times* and *The International Times* and operates the news website nytimes.com.

The News Leaders Association was formed via the merger of the American Society of News Editors and the Associated Press Media Editors in September 2019. It aims to foster and develop the highest standards of trustworthy, truth-seeking journalism; to advocate for open, honest and transparent government; to fight for free speech and an independent press; and to nurture the next generation of news leaders committed to spreading knowledge that informs

3

democracy.

POLITICO is a global news and information company at the intersection of politics and policy.  Since its launch in 2007, POLITICO has grown to nearly 300 reporters, editors and producers.  It distributes 30,000 copies of its Washington newspaper on each publishing day and attracts an influential global audience of more than 35 million monthly unique visitors across its various platforms.

Radio Television Digital News Association ("RTDNA") is the world's largest and only professional organization devoted exclusively to electronic journalism.  RTDNA is made up of news directors, news associates, educators and students in radio, television, cable and electronic media in more than thirty countries.  RTDNA is committed to encouraging excellence in the electronic journalism industry and upholding First Amendment freedoms.

Reveal from The Center for Investigative Reporting, founded in 1977, is the nation's oldest nonprofit investigative newsroom.  Reveal produces investigative journalism for its website https://www.revealnews.org/, the Reveal national public radio show and podcast, and various documentary projects.  Reveal often works in collaboration with other newsrooms across the country.

The Society of Environmental Journalists is the only North American membership association of professional journalists dedicated to more and better coverage of environment-related issues.

Society of Professional Journalists ("SPJ") is dedicated to improving and protecting journalism.  It is the nation's largest and most broad-based journalism organization, dedicated to encouraging the free practice of journalism and stimulating high standards of ethical behavior.  Founded in 1909 as Sigma Delta Chi, SPJ promotes the free flow of information vital

to a well-informed citizenry, works to inspire and educate the next generation of journalists, and protects First Amendment guarantees of freedom of speech and press.

The Tully Center for Free Speech began in fall 2006, at Syracuse University's S.I. Newhouse School of Public Communications, one of the nation's premier schools of mass communications.

The Washington Post (formally, WP Company LLC d/b/a The Washington Post) is a news organization based in Washington, D.C.  It publishes *The Washington Post* newspaper and the website www.washingtonpost.com and produces a variety of digital and mobile news applications.  The Post has won forty-seven Pulitzer Prizes for journalism, including awards in 2018 for national and investigative reporting.