**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| IN RE: JUROR QUESTIONNAIRES IN UNITED STATES V. STONE | Civil Action No.  1:20-mc-00016-ABJ<br><br>Hon. Amy Berman Jackson |

**JURORS' BRIEF IN OPPOSITION TO RELEASE OF QUESTIONNAIRES**

# TABLE OF CONTENTS

**Page**

Introduction ...................................................................................................................1

Statement of Facts .......................................................................................................2

    A.    United States v. Stone ...............................................................2

    B.    Jury Selection ...........................................................................4

    C.    Trial ..........................................................................................9

    D.    Post-Trial Developments .......................................................11

Argument ....................................................................................................................13

    I.    All Three Branches of Government Recognize the Importance of Safeguarding Juror Privacy in the Limited Circumstances Where Jury Service Substantially Threatens the Jurors' Security and Privacy ..............................15

    II.    The Court's Tailored Protections for Juror Privacy Were and Remain an Appropriate Response to Exceptional Security Threats and Risks of Harassment ..............................................................................................................19

        A.    As This Court Has Already Found, the Intense Publicity Surrounding the Stone Case and the Threats and Harassment the Jurors Continue to Face Make Protecting the Questionnaires from Release Necessary to Safeguard the Jurors' Privacy and Security. ...............................................................................19

        B.    The Jurors Are Affirmatively Requesting that the Questionnaires Remain Sealed Because They Believe that Continued Protection of the Questionnaires Is Necessary to Safeguard Their Privacy and Security. ............................................23

        C.    There Is No Alternative Means Available to Protect the Jurors' Privacy and Security. ..................................................24

    III.    Petitioner Has Not Shown that His General Interest in Obtaining Additional Information Overcomes the Jurors' Continued Privacy and Security Interests or Requires Reversing the Court's Tailored Juror Protections ....................................................................................................26

        A.    The Exceptional Threats to the Jurors' Privacy and Security Have Not Diminished Since Trial's End. ..............................27

        B.    In Contrast, the Trial's End Weakens Petitioner's Interest in Accessing the Questionnaires, Particularly Because Alternate Proceedings Are Fully Evaluating Potential Juror Bias ...................31

Conclusion ..................................................................................................................32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Griffin*,
  397 F.3d 515 (7th Cir. 2005) ..........................................................................15, 17

*Cable News Network, Inc. v. United States* (*CNN*),
  824 F.2d 1046 (D.C. Cir. 1987) (per curiam) ...........................................14, 18, 19

*Carpenter v. United States*,
  138 S. Ct. 2206 (2018) .............................................................................................21

*Douglas Oil Co. of Cal. v. Petrol Stops Nw.*,
  441 U.S. 211 (1979) .................................................................................................30

*Estes v. Texas*,
  381 U.S. 532 (1965) .................................................................................................20

*Globe Newspaper Co. v. Hurley*,
  920 F.2d 88 (1st Cir. 1990) .....................................................................................28

*Katz v. United States*,
  389 U.S. 347 (1967) .................................................................................................21

*Kyllo v. United States*,
  533 U.S. 27 (2001) ...................................................................................................21

*Ontario v. Quon*,
  560 U.S. 746 (2010) .................................................................................................21

*Presley v. Georgia*,
  558 U.S. 209 (2010) .....................................................................................13, 16, 19

*Press-Enterprise Co. v. Superior Court* (*Press-Enterprise I*),
  464 U.S. 501 (1984) ....................................................................................... *passim*

*Press-Enterprise Co. v. Superior Court* (*Press-Enterprise II*),
  478 U.S. 1 (1986) .....................................................................................................21

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980) .................................................................................................31

*Riley v. California*,
  573 U.S. 373 (2014) .................................................................................................21

*Sheppard v. Maxwell*,
    384 U.S. 333 (1966) ........................................................................................17, 20

*United States v. Antar*,
    38 F.3d 1348 (3d Cir. 1994) ..................................................................................17

*United States v. Barnes*,
    604 F.2d 121 (2d Cir. 1979) ..................................................................................16

*United States v. Blagojevich* (*Blagojevich I*),
    612 F.3d 558 (7th Cir. 2010) .........................................................17, 26, 30, 31

*United States v. Blagojevich* (*Blagojevich II*),
    614 F.3d 287 (7th Cir. 2010) ..................................................................................18

*United States v. Blagojevich* (*Blagojevich III*),
    743 F. Supp. 2d 794 (N.D. Ill. 2010) ...............................................................26

*United States v. Branch*,
    91 F.3d 699 (5th Cir. 1996) ..................................................................................15

*United States v. Brown*,
    250 F.3d 907 (5th Cir. 2001) ...............................................................27, 28, 29

*United States v. Bruno*,
    700 F. Supp. 2d 175 (N.D.N.Y. 2010) ...........................................19, 25, 29

*United States v. Calabrese*,
    515 F. Supp. 2d 880 (N.D. Ill. 2007) ...............................................................30

*United States v. Crockett*,
    979 F.2d 1204 (7th Cir. 1992) ..............................................................................16

*United States v. Darden*,
    70 F.3d 1507 (8th Cir. 1995) ..................................................................................16

*United States v. Deitz*,
    577 F.3d 672 (6th Cir. 2009) ..................................................................................16

*United States v. Dinkins*,
    691 F.3d 358 (4th Cir. 2012) ..................................................................................16

*United States v. Edmond*,
    52 F.3d 1080 (D.C. Cir. 1995) ..............................................................................16

*United States v. Jones*,
    565 U.S. 400 (2012) ..................................................................................................21

*United States v. Krout*,
66 F.3d 1420 (5th Cir. 1995) ............................................................................16

*United States v. Mathis*,
932 F.3d 242 (4th Cir. 2019) ............................................................................15

*United States v. Moore*,
651 F.3d 30 (D.C. Cir. 2011) ............................................................................15

*United States v. Ramírez-Rivera*,
800 F.3d 1 (1st Cir. 2015) ................................................................................16

*United States v. Ross*,
33 F.3d 1507 (11th Cir. 1994) ..........................................................................16

*United States v. Scarfo*,
850 F.2d 1015 (3d Cir. 1988) ..............................................................15, 16, 26

*United States v. Shryock*,
342 F.3d 948 (9th Cir. 2003) ............................................................................16

*United States v. Thomas*,
757 F.2d 1359 (2d Cir. 1985) ...........................................................................16

*United States v. Wecht*,
537 F.3d 222 (3d Cir. 2008) ........................................................................17, 32

*Waller v. Georgia*,
467 U.S. 39 (1984) ......................................................................................13, 26

*In re Washington Post*,
1992 WL 233354 (D.D.C. July 23, 1992) ........................................................30

## Statutes & Rules

28 U.S.C. § 1863 (originally enacted by Jury Selection and Service Act of 1968,
Pub. L. 90-274 § 101, 82 Stat. 53, 56) .............................................................15

D.D.C. LCrR 57.7 .....................................................................................................18

Jury Selection Plan For the U.S. District Court for the District of Columbia .............17

## Other Authorities

@realDonaldTrump, Twitter (Feb. 25, 2020, 4:01 PM), https://twitter.com
/realdonaldtrump/status/1232395209125707776 .......................................11

@realDonaldTrump, Twitter (Jan. 25, 2019, 12:16 PM),
https://twitter.com/realdonaldtrump/status/1088832908494888961 ..........................3

Aja Romano, *What We Still Haven't Learned from Gamergate*, Vox, Jan. 20, 2020, https://www.vox.com/culture/2020/1/20/20808875/gamergate-lessons-cultural-impact-changes-harassment-laws ...................................................................21

The Alex Jones Show, *#EpsteinDidntKillHimself Takes Over the Planet As A Global Awakening Accelerates*, InfoWars, Nov. 6, 2019, http://tv.infowars.com/index/display/id/10153 .................................................................8

The Alex Jones Show, *ABC News Caught Protecting Deep State Child Trafficking Ring + Trump Declares War*, InfoWars, Nov. 5, 2019, http://tv.infowars.com/index/display/id/10149 ........................................................................8

Ashraf Khalil, *Roger Stone leaves Day 1 of trial early over food poisoning*, Associated Press, Nov. 5, 2019, https://apnews.com/bf3e43dc56f244bd a7dd6c4308d38e1d ..............................................................................................8

Bobby Allyn & Ryan Lucas, *Judge Weighs Roger Stone's Bid For A New Trial As Trump Attacks Her On Twitter*, NPR, Feb. 25, 2020, npr.org/2020/02/25/809400156/judge-weighs-roger-stones-bid-for-a-new-trial-as-trump-attacks-her-on-twitter ...........................................................13

Cecilia Kang & Adam Goldman, *In Washington Pizzeria Attack, Fake News Brought Real Guns*, N.Y. Times, Dec. 5, 2016, https://www.nytimes.com/2016/12/05/business/media/comet-ping-pong-pizza-shooting-fake-news-consequences.html ................................................................................................22

Darren Samuelsohn & Josh Gerstein, *Medical emergencies and Milo Yiannopoulos: Roger Stone's trial opens*, Politico, Nov. 5, 2019, https://www.politico.com/news/2019/11/05/roger-stone-trial-opens-065991 ................................................8

Deanna Paul, *Alex Jones threatened to name a Roger Stone juror. Experts say that might be jury tampering,* Wash. Post, Nov. 7, 2019, https://www.washingtonpost.com/politics/2019/11/07/alex-jones-threatened-name-roger-stone-juror-experts-say-that-might-be-jury-tampering/ ....................................3, 8

Gina Kolata, *Your Data Were 'Anonymized'? These Scientists Can Still Identify You*, N.Y. Times, July 23, 2019, https://www.nytimes.com/2019/07/23/health/data-privacy-protection.html ..........................24

*How Internet Mob Justice Can Easily Destroy Innocent Lives*, The Observer, May 31, 2019, https://observer.com/2019/05/internet-mob-justice-innocent-lives/ .......................21

Matt Shapiro, *Conservatives Need More Than Courage*, The National Review, Aug. 28, 2019, https://www.nationalreview.com/2019/08/conservatives-need-more-than-courage/ ................................................................................................22

Megan Mineiro, *Illness Forces Roger Stone to Leave Trial During Jury Selection*,
   Courthouse News, Nov. 5, 2019, https://www.courthousenews.com/illness-
   forces-roger-stone-to-leave-trial-jury-selection/ ..................................................................8

Reporters Committee For Freedom of the Press, *The Right of Access to Juror
   Names and Addresses*, *available at* https://www.rcfp.org/journals/news-
   media-and-law-summer-2016/right-access-juror-names-an/ ..................................................26

Spencer S. Hsu, *Roger Stone excused from court because of illness as jury
   selection for his trial continues*, Wash. Post, Nov. 5, 2019, https://
   www.washingtonpost.com/local/legal-issues/roger-stone-excused-from-court-
   because-of-illness-as-jury-selection-for-his-trial-continues/2019/11/05/
   3828ca16-000f-11ea-8bab-0fc209e065a8_story.html ..............................................................8

*Tucker Carlson: Why the Roger Stone case should horrify you, whether you're
   Republican or Democrat*, Fox News, Feb. 14, 2020,
   https://www.foxnews.com/opinion/tucker-carlson-why-the-roger-stone-case-
   should-horrify-you-whether-youre-republican-or-democrat ..................................................11

Vandana Rambaran, *Roger Stone excused from first day of his trial after claiming
   food poisoning*, Fox News, Nov. 5, 2019, https://www.
   foxnews.com/politics/roger-stone-dismissed-from-jury-selection-in-trial-after-
   claiming-food-poisoning ..........................................................................................................8

*Who is Alex Jones and what is the InfoWar? . . . And why should you care?*,
   Infowars, https://www.infowars.com/about-alex-jones/ ..........................................................8

Zoe Quinn, *What It's like to Be Targeted by an Online Mob*, KQED, Jan. 30,
   2018, https://www.kqed.org/futureofyou/438097/what-its-like-for-a-woman-
   to-be-targeted-by-an-online-mob ............................................................................................22

## INTRODUCTION

Our Nation asks its citizens to bear significant burdens in order to guarantee criminal defendants an impartial jury.  Jurors spend time away from their jobs and day-to-day lives, carry the weight of sitting in judgment of their fellow citizens and, as part of the selection process, often undergo invasive questioning to probe their suitability—questioning that can, and sometimes must, surface intimate information.

What our Nation does not do, however, is require jurors to bear as a consequence of their service the additional burdens of surrendering their personal privacy and security, or being subjected to incendiary or false accusations, harassment, embarrassment or potential humiliation. Criminal defendants have their liberty on the line, and high-profile trials often stoke intense public passions.  Jurors may thus find themselves, in the rare case, subject to intimidation or, even worse, threats of violence, and service under such conditions is neither fair to the individual jurors nor consistent with the impartial administration of justice.  All three branches of our government accordingly recognize that courts, in the appropriate case, must have the authority to take practical, commonsense steps to protect jurors from such mistreatment.

That is precisely what occurred here.  This case arises out of the widely-publicized trial of Roger Stone, which has in fact exposed the Jurors[1] to harassment, intimidation, and other dangers. The Court accordingly concluded it was necessary to take modest steps to protect the Jurors' safety and privacy, including sealing—with the consent of the parties—the questionnaires the Jurors completed as part of the selection process.

---

[1] As used in this Brief, "Jurors" refers to Jurors A–L who have appeared through Counsel in this case.

The question before the Court now is whether it should reverse those protections and provide Petitioner access to the juror questionnaires.  As Petitioner argues, and the Jurors agree, the press unquestionably has an important right of access to judicial proceedings, a right the Court took extensive steps to accommodate during the pre-trial *voir dire* and the trial—both of which were heavily attended and extensively reported upon by the press.

The Supreme Court has been clear, however, that the press's right of access to judicial proceedings is not unlimited and must be "balanced against" the legitimate privacy and security interests of jurors.  *See Press-Enterprise Co. v. Superior Court* (*Press-Enterprise I*), 464 U.S. 501, 511–12 (1984).  Not a single party or *amicus* contends that the modest steps the Court took to protect the Jurors, both before and during *Stone* trial, struck this balance inappropriately.  The relevant equities, moreover, tilt even more strongly in the Jurors' favor now:  the trial itself is over, yet—as the Court has already found during post-trial proceedings—the threats to the Jurors' safety and privacy persist.  Indeed, the record shows that the Jurors have been subject to continued harassment since the trial concluded and that the release of the questionnaires would only exacerbate the significant risks the Jurors face.  On the special facts present here, it is necessary— indeed essential—for the Jurors' protections to remain in place.  Otherwise, the balancing required by the Supreme Court to protect jury privacy is no better than lip service.

## STATEMENT OF FACTS

### A.    United States v. Stone

On January 24, 2019, prosecutors from the Department of Justice's Office of the Special Counsel indicted Roger Stone for one count of obstructing a congressional proceeding, one count of tampering with a witness to that proceeding, and five counts of making false statements to Congress in the course of the same.  Roger Stone is a well-known political consultant and lobbyist with a career that stretches back to service in the Nixon administration.  The charges centered on

Stone's testimony before the U.S. House of Representatives Permanent Select Committee on Intelligence about his role as an intermediary between WikiLeaks and the 2016 Trump campaign. At the time of the indictments, former FBI Director and Acting Deputy Attorney General Robert Mueller was the Special Counsel, charged with investigating the Russian Government's possible interference in the 2016 presidential election and the possibility of a criminal conspiracy involving the campaign of then-candidate Donald J. Trump.

Given the high profile of the participants and the explosive charges, Stone's case unsurprisingly attracted a whirlwind of media attention. Every major news outlet, including *The New York Times*, the *Washington Post*, and the *Wall Street Journal*, reported on this case. Print, television, and Internet coverage was extensive. The case, moreover, generated intense public passions and scrutiny from its very outset—including from the highest office in the land. The day after Stone was indicted, President Trump tweeted as follows: "Greatest Witch Hunt in the History of our Country! NO COLLUSION! Border Coyotes, Drug Dealers and Human Traffickers are treated better. Who alerted CNN to be there?" @realDonaldTrump, Twitter (Jan. 25, 2019, 12:16 PM), https://twitter.com/realdonaldtrump/status/1088832908494888961. Once the trial proceedings commenced, they became instant fodder for Internet "conspiracy theorists" like Alex Jones and others, as extensively reported in the press.[2] At no point during the trial did this media and public interest wane, and, indeed, it persists to this day.

---

[2] *See, e.g.*, Deanna Paul, *Alex Jones threatened to name a Roger Stone juror. Experts say that might be jury tampering,* Wash. Post, Nov. 7, 2019, https://www.washingtonpost.com/politics /2019/11/07/alex-jones-threatened-name-roger-stone-juror-experts-say-that-might-be-jury-tampering/.

**B.     Jury Selection**

In light of this intense publicity and public passion, the Court and parties recognized it would be necessary to implement a special jury selection protocol that protected the privacy of the Jurors, while simultaneously protecting the defendant's rights and ensuring an open and public trial with almost unfettered media access.

**1.     The Juror Questionnaire**

As a first step in this process, both the Court and the parties agreed that using a questionnaire to pre-screen jurors would be the best way to secure a significant amount of information quickly without unduly burdening the prospective jurors. *See Stone* Minute Order dated Aug. 13, 2019; *Stone* ECF Nos. 192, 193. As the Court explained to the prospective jurors on September 12: "In this case we're taking the extra step of posing questions to you first in writing, and that's the only thing that's going to happen today. This way we can obtain important information from all of you at the same time, and that should streamline the process of questioning you individually, if you are brought back to do that later." *Stone* ECF No. 356 (9/12/19 Tr.) at 8:23–9:3.

The jury questionnaires were 20 pages long, and contained 56 questions agreed upon by the Government and counsel for Stone. *Stone* ECF No. 247. They asked prospective jurors to reveal information that is sensitive, personal, and personally identifying. *See id.* For example, the questionnaires asked prospective jurors to disclose, among other things:

- Age and gender (Question 2)

- Marital status (Question 3)

- Education information for prospective juror and partner/spouse (Question 4)

- Employment information for prospective juror and partner/spouse: job title/occupation, name of employer, length of employment (Questions 5–11)

4

- Explanation of whether prospective juror, close friend, or family member has ever worked in any aspect of the legal field (Question 13)

- Explanation of whether prospective juror, close friend, or family member has ever applied for employment with, was employed by, or received training by any local, state, or federal law enforcement agency (Question 14)

- Organizational affiliations and activities (Question 18)

- Explanation of whether prospective juror, close friend, or family member has ever run for or held a political office (Question 24)

- Explanation of whether prospective juror, close friend, or family member has ever been employed or had any association or connection with Congress or a congressional committee (Question 31)

- Explanation of whether prospective juror, close friend, or family member has been the victim of a crime (Questions 36–38)

- Explanation of whether prospective juror, close friend, or family member has been arrested for, charged with, prosecuted for, or convicted of any crime (Question 41)

- Explanation of whether prospective juror has ever been involved in any legal proceeding in any capacity (Questions 45–47)

Recognizing the sensitive nature of the information at issue, the Court instructed the prospective jurors that, as agreed by the parties, their identities and the information they disclosed would remain private. The first paragraph of the "Instructions for Jury Questionnaire" stated:

> The parties and the Court have agreed that all information contained in this questionnaire will be kept confidential; to the extent the Court is ever required to release any responses in the questionnaires, your name will not be publicly released.

*Stone* ECF No. 247 at 1. The Court also provided express verbal assurances to the Jurors about protecting their identity and privacy:

> Some of the questions may seem personal, but they're all designed to help ensure that we have a fair and impartial jury. In case you are concerned about this, I want to assure you that your names are not going to be made public at this time and it's our intention that your answers to these questionnaires will not be made public.
>
> To protect your identity, the only part of the questionnaire that

5

> includes your name is the certification you will sign on the last page. And if, on the date you return for the completion of the jury selection process, we need to discuss your answers with you, you're not going to have to talk in front of all the other jurors. We're going to let you speak to the parties in the case one at a time.

*Stone* ECF No. 356 (9/12/19 Tr.) at 9:4–16.

Under the protection of this confidentiality and anonymity, the Jurors provided uninhibited, detailed responses to the questionnaires that revealed extensive amounts of personal, sensitive, and identifying information.  For example, the Jurors' completed questionnaires contained information including, but not limited to, the following:

- Detailed employment information concerning the Jurors, the Jurors' spouses or partners, and the Jurors' children, including employment by the federal government—some in positions working for or with political appointees—or by organizations dependent on federal funding;

- The names of family members and friends who had either committed or been the victim of a crime;

- Names and descriptions of family members and friends employed at law enforcement agencies;

- Names and descriptions of family members' military service;

- Names and descriptions of family members employed in legal field;

- Religious, personal, and addiction organizational affiliations;

- Case name and description of a personal family law case to which a juror was a party; and

- A description of violent crimes to which a juror was a witness, victim, or friend of the victim, including childhood assaults.

6

As the Jurors note in the attached declarations,[3] they consider this information deeply personal, included it on the questionnaire with the expectation that it would never be exposed to the public or the press, and are deeply concerned about the ramifications if it is so exposed. Indeed—as the attached expert declaration from a leading privacy and cyberstalking scholar makes clear—the breadth and depth of the information contained in the questionnaires and the relatively small size of the jury pool makes it extremely likely that the Jurors' responses would identify them even if their names were redacted.  *See attached* Declaration of Professor Danielle K. Citron ¶ 7.

### 2.      Oral *Voir Dire*

The next step in the jury selection protocol was oral *voir dire.*   Based on the juror questionnaires, the parties called approximately eighty of the over one hundred prospective jurors back to the Court on November 5.  The public and press were present in the courtroom as the parties questioned these prospective jurors, who were identified by juror number instead of name. As the Court recognized in greeting observers entering the courtroom, "a trial is a public proceeding," which everyone is "welcome to observe."  *See Stone* ECF No. 294 (11/5/19 Morning Tr.) at 20:6–13.  Consistent with this view, with the exception of a few instances where the Court conducted private bench conferences with prospective jurors who asked to answer certain questions privately, all of the questioning was open to media and members of the public, and the Court subsequently included all of these sidebar conferences in public, unredacted transcripts.

---

[3] Per LCvR 5.4(b)(5), by electronically filing the attached Juror Declarations, Jurors' Counsel certifies that the original signed documents are in his possession and available for *in camera* review if the Court so requests.  The original signed Declaration of Professor Danielle K. Citron is likewise in the possession of Jurors' Counsel, and is available for review by the Court or a party.

Open, oral *voir dire* lasted through the end of the day on November 5, and the press covered it heavily, with many articles discussing the substantive questioning of particular jurors.[4]   Attempts to expose and harass prospective jurors began almost simultaneously.   For example, on November 5, 2019, Alex Jones of Infowars.com[5] claimed that one of the prospective jurors was a former aide to President Barack Obama, and urged viewers to "look up [the prospective juror's] husband"—a purported "member of the deep state intelligence community."[6]   A day later, Jones threatened to release the name of a prospective juror, stating that the prospective juror is "one of their minions, and we've got her name, and we're going to release it."[7]

---

[4] *See, e.g.*, Spencer S. Hsu, *Roger Stone excused from court because of illness as jury selection for his trial continues*, Wash. Post, Nov. 5, 2019, https://www.washingtonpost.com /local/legal-issues/roger-stone-excused-from-court-because-of-illness-as-jury-selection-for-his-trial-continues/2019/11/05/3828ca16-000f-11ea-8bab-0fc209e065a8_story.html; Megan Mineiro, *Illness Forces Roger Stone to Leave Trial During Jury Selection*, Courthouse News, Nov. 5, 2019, https://www.courthousenews.com/illness-forces-roger-stone-to-leave-trial-jury-selection/; Ashraf Khalil, *Roger Stone leaves Day 1 of trial early over food poisoning*, Associated Press, Nov. 5, 2019, https://apnews.com/bf3e43dc56f244bda7dd6c4308d38e1d; Vandana Rambaran, *Roger Stone excused from first day of his trial after claiming food poisoning*, Fox News, Nov. 5, 2019, https://www.foxnews.com/politics/roger-stone-dismissed-from-jury-selection-in-trial-after-claiming-food-poisoning; Darren Samuelsohn & Josh Gerstein, *Medical emergencies and Milo Yiannopoulos: Roger Stone's trial opens*, Politico, Nov. 5, 2019, https://www. politico.com/news/2019/11/05/roger-stone-trial-opens-065991.

[5] *See Who is Alex Jones and what is the InfoWar? . . . And why should you care?*, Infowars, https://www.infowars.com/about-alex-jones/ (quoting *Rolling Stone*'s description of Alex Jones as "a giant in America's conspiracy subculture").

[6] The Alex Jones Show, *ABC News Caught Protecting Deep State Child Trafficking Ring + Trump Declares War*, InfoWars, Nov. 5, 2019 (beginning at 2:12:00), http://tv.infowars.com /index/display/id/10149.

[7] The Alex Jones Show, *#EpsteinDidntKillHimself Takes Over the Planet As A Global Awakening Accelerates*, InfoWars, Nov. 6, 2019 (beginning at 00:13:45), http://tv.infowars.com /index/display/id/10153; *see also* Deanna Paul, *Alex Jones threatened to name a Roger Stone juror. Experts say that might be jury tampering,* Wash. Post, Nov. 7, 2019, https://www. washingtonpost.com/politics/2019/11/07/alex-jones-threatened-name-roger-stone-juror-experts-say-that-might-be-jury-tampering/.

### C.     Trial

In light of these threats, and the high profile nature of the trial, the Court decided to maintain the Jurors' anonymity and put in place modest additional protections.  In particular, on October 25, 2019, the Court issued an order that established trial logistics.  *See Stone* ECF No. 242. That order provided as follows: "Any attempt to contact or interact with [J]urors, to obtain the locations of their residences or job sites, or to otherwise ascertain their identities in any way is strictly prohibited."  *Stone* ECF No. 242, § IX(A).  The Court also took steps to safeguard the Jurors' privacy and safety during the trial.  As the Court stated during oral *voir dire*: "We will make arrangements, though, for the jurors who are selected to serve to come and go from the courthouse in a private manner so that you do not have to interact with other people or make your way through any crowds that gather at any of the public entrances."  *Stone* ECF No. 296 (11/5/19 Morning Tr.) at 13:8–12.

At the same time, the Court took numerous steps to ensure media access to the proceedings. In the order setting forth trial logistics, the Court reserved seats in the courtroom for members of the press, allowed members of the media and the general public to occupy all remaining seats and, set aside both an overflow courtroom and a separate Media Room to help facilitate press and public access to the proceedings:

> The second row of the left side of the courtroom (facing the bench) will be reserved for members of the media.
>
> ***
>
> Members of the general public and the media may occupy all remaining rows of seats.
>
> ***
>
> Members of the general public and the media are permitted to access the designated "overflow courtroom" to view a live audio/video feed

of the proceedings in Courtroom 3. Signs will be posted indicating the location of the overflow courtroom.

\*\*\*

Members of the media may view a live audio/video feed from Courtroom 3 in the Media Room located in room 1206 on the first floor of the courthouse.

*Stone* ECF No. 242 §§ II(A)(5), (7); IV(A), (B).

During the trial, the Court also made sure that counsel and members of the press were aware of the Media Room.  During the public pretrial conference held on November 4, the Court noted that "beginning with the openings, we're going to have an overflow courtroom available, and we're going to have the media room available, where there will be a live feed of the sound from this courtroom going to other places."  *Stone* ECF No. 293 (11/4/19 Tr.) at 4:16–19.  In the morning of November 6, before opening statements were given, the Court stated, "Members of the media who wish to be transmitting to their organizations in real time what's going on can listen to the proceedings in the media room, which is established for you for that purpose."  *Stone* ECF No. 296 (11/6/19 Morning Tr.) at 246:19–22.

Given this nearly unfettered access to the proceedings, numerous news outlets covered the trial from *voir dire* to verdict, and have continued to cover the ongoing post-trial proceedings.  There are scores—if not hundreds—of videos, articles, and opinion pieces about the Stone trial published by major news outlets, such as *Fox News*, *The New York Times*, the *Washington Post*, and the *Wall Street Journal*.  Other outlets across every medium—print, television, Internet, and others—have also covered the trial extensively.  Moreover, much of this coverage has focused on the Jurors, both during jury selection and after the trial.  In light of this intense media scrutiny and focus on the Jurors, immediately after the verdict, numerous jurors expressed concern to the Court

10

about their privacy, and the Court acknowledged their concerns.  *See attached* Juror A Decl. ¶ 6;

Juror B Decl. ¶ 6; Juror C Decl. ¶ 3.c; Juror I Decl. ¶ 4.b; Juror J Decl. ¶ 3.c.

      **D.**     **Post-Trial Developments**

         **1.**     **Continued Harassment**

     Unfortunately, the end of the trial did not bring an end to hostility towards and actual

harassment of the Jurors.  Prominent commentators continued to attack them.[8]  As such, even with

the trial long since over, there is still a very real risk that the disclosure of the Jurors' identities or

contents of their questionnaires under these circumstances would likely go viral in certain sectors

of the Internet and lead to increased harassment.  *See* Citron Decl. ¶ 7.

     Given this reality, in the several months that have passed since the trial ended, most of the

Jurors have chosen to remain completely anonymous.  *See attached* Jurors A, B, C, D, E, F, H, I,

J, and L Decls.  Only two jurors have made any form of public statement since the trial concluded:

the foreperson posted on social media about the trial, and another juror made appearances on news

networks and wrote two op-eds about the trial and the jury's deliberations.  *See attached* Jurors G

& K Decls.  The foreperson did not make any further public statements about the case except to

verify the authenticity of the social media post. *See attached* Juror K Decl. ¶ 5.  However, the

foreperson continues to face harassment, threats, and vitriolic public criticism, which has included

accusatory emails, threatening letters mailed to their home, vituperative attacks on major news

---

    [8] *See* @realDonaldTrump, Twitter (Feb. 25, 2020, 4:01 PM), https://twitter.com
/realdonaldtrump/status/1232395209125707776 ("There has rarely been a juror so tainted as the
forewoman in the Roger Stone case. Look at her background. She never revealed her hatred of
'Trump' and Stone. She was totally biased, as is the judge. Roger wasn't even working on my
campaign. Miscarriage of justice. Sad to watch!"); *see also Tucker Carlson: Why the Roger Stone
case should horrify you, whether you're Republican or Democrat*, Fox News, Feb. 14, 2020
(beginning at 3:03), https://www.foxnews.com/opinion/tucker-carlson-why-the-roger-stone-case-
should-horrify-you-whether-youre-republican-or-democrat.

networks and by public officials, and an onslaught of Tweets (including two from the President of the United States). *Id.* ¶ 6. The other publicly identified Juror has also received criticism on social media and a threatening letter mailed to the Juror's home address. *See attached* Juror G Decl. ¶ 5. Having witnessed this harassment, all of the other Jurors have remained silent, guarding their privacy out of fear of similar mistreatment. *See attached* Juror A Decl. ¶ 7; Juror B Decl. ¶¶ 8–9; Juror C Decl. ¶ 5; Juror D Decl. ¶¶ 7–8; Juror E Decl. ¶ 6; Juror F Decl. ¶ 6; Juror H Decl. ¶ 6; Juror I Decl. ¶ 6; Juror J Decl. ¶ 7; Juror L Decl. ¶¶ 6–7. They have withdrawn from their normal online activities, and remain concerned that exposure of their identities or questionnaire responses could harm the safety, well-being, and privacy of themselves and their loved ones. *See attached, e.g.*, Juror A Decl. ¶ 7; Juror D Decl. ¶ 8.

### 2. Stone's Allegations of Bias and Motions for a New Trial

This Court, moreover, has addressed the heavily publicized concerns about jury impartiality in the context of two different motions for a new trial.

Mr. Stone filed his first motion under seal, contesting the Court's decisions on certain for-cause challenges made during *voir dire*. *See Stone* ECF No. 266 (Sealed). In a public order denying that motion, the Court described written and oral responses by individual jurors during *voir dire* but redacted all personally identifying information. *See Stone* ECF No. 288.

Mr. Stone's second new trial motion, also filed under seal, argued that the jury foreperson was unfairly biased and failed to disclose as much during *voir dire*. *See Stone* ECF No. 313. The Court held a hearing on that motion in a closed courtroom, while piping a live audio feed of the hearing (including testimony by certain jurors) in the adjacent courtroom. *See generally Stone* ECF No. 347 (2/25/20 Hearing Tr.). As the Court explained, "every single aspect of this proceeding will be public, with a very limited exception of what any testifying jurors look like and

12

what their names, online account names are, and their juror numbers are." *Stone* ECF No. 346 (2/25/20 Tr.) at 19:9–13.

The Court supported its decision to partially close the motion hearing with a detailed set of findings under *Waller v. Georgia*, 467 U.S. 39 (1984), *Presley v. Georgia*, 558 U.S. 209 (2010), and *Press-Enterprise I*, 454 U.S. 501 (1984). *Stone* ECF No. 346 (2/25/20 Tr.) at 5:22–7:5. Reviewing the intense publicity surrounding the *Stone* trial, the Court recounted much of the harassment described above, noting that prominent commentators repeatedly "went after the jury" with inflammatory and demonstrably false accusations. *Id.* at 9:10–11:15; 16:12–20. The Court noted that "without question" there remained an "extremely high" risk that any juror identified by name or appearance would be subject to "harassment and intimidation." *Id.* at 11:16–12:2; 16:4–11. The Court concluded that under *Waller*, *Presley*, and *Press-Enterprise I*, there was a "specific and significant interest in juror safety" that "overr[ode]" the "public interest in an entirely open proceeding." *Id.* at 15:24–16:3. Thus, on its own motion, the Court crafted a narrowly-tailored partial closure to balance appropriately those interests with the minimum incidental burden imposed on the press. *Id.* at 17:3–6. And indeed, there was significant press coverage of the partially-closed hearing. *See, e.g.*, Bobby Allyn & Ryan Lucas, *Judge Weighs Roger Stone's Bid For A New Trial As Trump Attacks Her On Twitter*, NPR, Feb. 25, 2020, npr.org/2020/02/25/809400156/judge-weighs-roger-stones-bid-for-a-new-trial-as-trump-attacks-her-on-twitter.

## ARGUMENT

There is no dispute that federal district courts have the authority, in exceptional circumstances, to take reasonable, commonsense steps to protect juror privacy and security. The Congress has expressly granted such authority. The Executive Branch frequently requests that

courts deploy it.  The Supreme Court and nearly every federal court of appeals has endorsed the practice.  And, under Supreme Court precedent, not only do courts have the authority to protect jurors' privacy and security, they have a duty to do so.  *See Press-Enterprise Co. v. Superior Court* (*Press-Enterprise I*), 464 U.S. 501, 512 (1984).  No party or *amicus* in this case challenges these general rules.

There is also no dispute that this Court appropriately used its authority in withholding the Jurors' identities and questionnaire responses from public disclosure both before and during trial. Under binding D.C. Circuit precedent, courts may put in place juror protections consistent with the Constitution's public trial requirements when the protections are necessary to protect the jurors' privacy and security interests, the jurors desire such protections, and there are no reasonable alternatives available.  *Cable News Network, Inc. v. United States* (*CNN*), 824 F.2d 1046, 1048 (D.C. Cir. 1987) (per curiam).  Those criteria were clearly present during the *Stone* trial and, again, no party or *amicus* disputes this.

As such, the only question before this Court is whether it is now necessary to reverse the protections that are already in place.  As Petitioner argues, and Jurors agree, the press unquestionably has an important right of access to judicial proceedings, and the Supreme Court has made clear that courts must balance "[t]he privacy interests of . . . juror[s] . . . against the historic values [of open criminal trials]."  *See Press-Enterprise I*, 464 U.S. at 512.  But it is also plain that the equities tilt even more strongly in the Jurors' favor now than they did during the long period when the protections went unchallenged.  The trial—which generated extensive media coverage, even with the protections in place—is over, and Stone has initiated not one, but two, proceedings to contest the jury's impartiality.  The Jurors, on the other hand, have continued to face threats, harassment, and invasions of their privacy, and, as the record before the Court shows,

14

and the declaration submitted by cyberstalking expert Professor Danielle K. Citron confirms, this mistreatment would only worsen if the questionnaires were released, even at this late date.  The Court should thus deny Petitioner's motion to release the questionnaires.

**I.      All Three Branches of Government Recognize the Importance of Safeguarding Juror Privacy in the Limited Circumstances Where Jury Service Substantially Threatens the Jurors' Security and Privacy.**

Jurors do not elect to serve on juries. Rather, they are "poorly paid conscripts," compelled by law to sit in judgment of their fellow citizens. *Anderson v. Griffin*, 397 F.3d 515, 519 (7th Cir. 2005).  It is one thing to ask jurors to upend their lives while they are performing their civic duty, but quite another to ask them to submit to extreme media scrutiny, harassment, or even threats to their safety and security.  Indeed, the jury system demands just the opposite—its "virtue" lies in the "random summoning from the community of twelve 'indifferent' persons . . . , *and* in their subsequent, unencumbered return to their normal pursuits." *United States v. Scarfo*, 850 F.2d 1015, 1023 (3d Cir. 1988) (citation omitted) (emphasis added); *United States v. Branch*, 91 F.3d 699, 723 (5th Cir. 1996) (quoting *Scarfo*).

Given this, for more than 50 years, Congress has expressly empowered federal courts to protect juror identities under appropriate circumstances.  28 U.S.C. § 1863(b)(7) (originally enacted by Jury Selection and Service Act of 1968, Pub. L. 90-274 § 101, 82 Stat. 53, 56).  In particular, in mandating that federal district courts develop plans for random jury selection, Congress made clear that such plans may "permit [district courts] to keep [prospective jurors'] names confidential in any case where the interests of justice so require." *Id.*

Consistent with that authority, juries empaneled under varying degrees of anonymity— often at the Government's request—are a wholly accepted feature of federal criminal practice. *See, e.g.*, *United States v. Moore*, 651 F.3d 30, 50 (D.C. Cir. 2011) (affirming district court's grant of Government's motion for a completely anonymous jury); *United States v. Mathis*, 932 F.3d 242,

15

253–54 (4th Cir. 2019) (affirming grant of Government's request that defense counsel be prohibited from sharing identifying juror information with defendants).  And the Supreme Court, along with every federal court of appeals to consider the issue, has recognized that reasonable, commonsense restrictions on public access to juror information—up to and including the empanelment of completely and permanently anonymous juries—can be imposed consistent with the public trial the Constitution requires.  *See Presley v. Georgia*, 558 U.S. 209, 215 (2010) ("There are no doubt circumstances where a judge could conclude that threats of improper communications with jurors or safety concerns are concrete enough to warrant closing *voir dire*."); *United States v. Edmond*, 52 F.3d 1080, 1091 (D.C. Cir. 1995) ("[W]e conclude that the District Court judge permissibly exercised his discretion in impaneling an anonymous jury.").[9]

As these courts have recognized, appropriately tailored protections for juror anonymity serve a range of crucial interests.  At the threshold, such safeguards serve the interests of justice in the particular cases where they are applied.  They "encourage honest answers" at *voir dire*, *Press-Enterprise I*, 464 U.S. at 515 (Blackmun, J., concurring), and "promote[] impartial decision making" in the jury room, *Scarfo*, 850 F.2d at 1023, where "explicit threats . . . or even a general fear of retaliation could well affect the jury's ability to render a fair and impartial verdict," *United States v. Thomas*, 757 F.2d 1359, 1364 (2d Cir. 1985).  These protections are especially valuable in high-profile cases, where "extensive publicity" can "enhance the possibility that jurors' names . . . become public and expose them to intimidation or harassment."  *Edmond*, 52 F.3d at

---

[9] *See also, e.g.*, *United States v. Ramírez-Rivera*, 800 F.3d 1 (1st Cir. 2015); *United States v. Barnes*, 604 F.2d 121 (2d Cir. 1979); *Scarfo*, 850 F.2d 1015; *United States v. Dinkins*, 691 F.3d 358 (4th Cir. 2012); *United States v. Krout*, 66 F.3d 1420 (5th Cir. 1995); *United States v. Deitz*, 577 F.3d 672 (6th Cir. 2009); *United States v. Crockett*, 979 F.2d 1204 (7th Cir. 1992); *United States v. Darden*, 70 F.3d 1507 (8th Cir. 1995); *United States v. Shryock*, 342 F.3d 948 (9th Cir. 2003); *United States v. Ross*, 33 F.3d 1507 (11th Cir. 1994).  The Tenth and Federal Circuits have not considered whether an anonymous jury is permissible.

1091; *see also United States v. Wecht*, 537 F.3d 222, 264–65 (3d Cir. 2008) (Van Antwerpen, J., dissenting) ("The privacy of jurors is a significant interest, as protecting that privacy is the best way to avoid harassment . . . ."); *Sheppard v. Maxwell*, 384 U.S. 333, 353 (1966) (public identification of jurors in a highly publicized case had "exposed them to expressions of opinion from both cranks and friends"). And, beyond any particular case, reasonable assurances that jurors will not be roughly "thrust into the role of celebrities," *see id.*, serve the jury system as a whole, since "harassment of jurors . . . may adversely affect the willingness of citizens to freely [serve]," *United States v. Antar*, 38 F.3d 1348, 1351 (3d Cir. 1994); *see also United States v. Blagojevich* (*Blagojevich I*), 612 F.3d 558, 561–62 (7th Cir. 2010) (recognizing fear "that public knowledge of . . . jurors' identities . . . would discourage others from agreeing to serve in future trials"); *see also Press-Enterprise I*, 464 U.S. at 515 (Blackmun, J., concurring) (noting the Government's interest in protecting juror privacy "even after the trial—to encourage juror honesty in the future").

Moreover, as numerous courts—including the Supreme Court—have recognized, protecting juror privacy advances interests beyond the administration of justice. There is independent value in respecting the dignity of jurors, for example, by "protect[ing jurors] from embarrassment" when *voir dire* "touches on deeply personal matters." *Press-Enterprise I*, 464 U.S at 511–12. Put simply, jurors "have a right not to be humiliated." *Anderson,* 397 F.3d at 519.

This Court is no exception in taking care to protect those interests. The Jury Selection Plan for this District provides that the "[n]ames of prospective and sitting petit jurors shall not be disclosed to the public outside of open court, except upon order of the court." Jury Selection Plan For the U.S. District Court for the District of Columbia, § K.1 (Reviewed February 29, 2016). Moreover, in "widely publicized or sensational criminal cases," this Court's Local Rules grant judges further discretion to "issue a special order governing such matters as . . . the seating and

17

conduct in the courtroom of spectators and news media representatives, the management and sequestration of jurors and witnesses, and any other matters which the Court may deem appropriate for inclusion in such an order."  D.D.C. LCrR 57.7(c).  Supreme Court and D.C. Circuit precedent hold that exercises of this authority to protect jurors by partially closing *voir dire* are judged using a three-part standard:

> "<u>First</u>, trial courts must make findings that an open *voir dire* proceeding threatens either the defendant's Sixth Amendment right to a fair trial or a prospective juror's privacy interests.  <u>Second</u>, in order to 'minimize the risk of unnecessary closure' trial courts should require prospective jurors to make 'affirmative request[s] for private *voir dire* examination.  <u>Finally</u>, trial courts must consider whether alternatives to closure are available that will adequately protect the interests of prospective jurors."

*CNN*, 824 F.2d at 1048 (emphasis added) (citing *Press-Enterprise I*, 464 U.S. at 511–12).

Juror privacy, as well as juror safety, are weighty interests under this standard:  "Jurors are entitled to be treated with respectful regard for their privacy and dignity, rather than as media prey."  *United States v. Blagojevich* (*Blagojevich II*), 614 F.3d 287, 292–93 (7th Cir. 2010) (Posner, J., dissenting from denial of rehearing en banc).  As the Supreme Court has recognized, these interests are especially acute during *voir dire*, when a prospective juror is subject not merely to compulsory appearance in a public proceeding, but to "interrogation" that may "touch[] on deeply personal matters that person has legitimate reasons for keeping out of the public domain."  *Press-Enterprise I*, 464 U.S. at 511.  Such sensitive information is "deserving of privacy protection," under *CNN* and *Press-Enterprise I*, and a juror's "valid privacy right may rise to a level that part of the transcript should be sealed, or the name of a juror withheld, to protect the person from embarrassment."  *Id.* at 512–13.

## II.     The Court's Tailored Protections for Juror Privacy Were and Remain an Appropriate Response to Exceptional Security Threats and Risks of Harassment.

The *CNN/Press-Enterprise* standard is easily satisfied here.  First, the record shows, this Court has already found, and no party or *amicus* disputes, that the highly charged "emotional and political climate" surrounding the *Stone* proceedings has left the Jurors exposed to substantial threats of harassment, retaliation, and physical harm.  *See United States v. Bruno*, 700 F. Supp. 2d 175, 185 (N.D.N.Y. 2010).  That "extremely high" risk justified partial closure of the hearing on Mr. Stone's new-trial motion, and likewise supports the questionnaires' continuing confidentiality. *See Stone* ECF No. 346 (2/25/20 Tr.) at 11:16–12:2, 15:12–19:19; *infra* Part II.A. Second, as this very proceeding and their declarations in support of it demonstrate, the Jurors strongly desire to keep their questionnaires private.  *See infra* Part II.B.  And, third, no alternative measures realistically exist to protect the Jurors from the threats arising out of their service.  *See infra* Part II.C.

### A.     As This Court Has Already Found, the Intense Publicity Surrounding the *Stone* Case and the Threats and Harassment the Jurors Continue to Face Make Protecting the Questionnaires from Release Necessary to Safeguard the Jurors' Privacy and Security.

As applicable here, the first prong of *CNN* and *Press-Enterprise I* requires explicit "findings that an open *voir dire* proceeding threatens . . . a prospective juror's privacy interests," *CNN*, 824 F.2d at 1048, or "safety concerns," *Presley*, 558 U.S. at 215.  Those findings must articulate the "particular interest[s], and threat[s] to th[ose] interest[s]," that justify closure, "along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Id.* (quoting *Press-Enterprise I*, 464 U.S. at 510).

Under any reasonable assessment, the record supports the necessary findings.  The prosecution of Mr. Stone has attracted intense media and public attention from its very beginnings. *Supra* at 3.  It arose out of perhaps the most pervasive and divisive news item of the past several

years—investigations into alleged Russian interference in the 2016 presidential election, *id.*—and

has been the subject of running commentary by the President of the United States, *id.*  And in the

midst of that highly charged atmosphere, the Jurors have been subject from the first day of *voir*

*dire* to a continuing campaign of harassment and attempted exposure—primarily but not

exclusively on the Internet.  *Supra* at 7–8, 11–12.

There is every reason, moreover, to think that release of the questionnaires would only lead

to more and potentially greater harassment.  The Jurors have already been attacked online, *see*

*supra* at 7–8, 11–12, and expert opinion (that is fully congruent with common sense) makes clear

that "[d]isclosing the identity of the [J]urors (and potentially their families, friends and close

associates) or the contents of their juror questionnaires would . . . likely transform the [J]urors (and

potentially their families, friends and close associates) into victims of an online information

cascade" leading to "harassment and conspiracy theories," including "repeated, unwanted,

intrusive, and frightening communications,"  *see attached* Citron Decl. ¶ 7.c, mob-driven

workplace retaliation, *id.* at ¶ 7.d, and a chilling effect on the Jurors' own speech and expressive

activity, *id.* at ¶ 7.e.

Indeed, these special dynamics here create precisely the sorts of harms that courts—

including the Supreme Court—have long recognized as posing a danger to jurors and the integrity

of criminal trials.  *See Estes v. Texas*, 381 U.S. 532, 545 (1965) (noting that it is "highly probable

that [the presence of television cameras in the courtroom] will have a direct bearing on [a juror's

vote]," because "[i]f the community be hostile to an accused a televised juror, realizing that he

must return to neighbors who saw the trial themselves, may well be" unable to remain impartial);

*Sheppard,* 384 U.S. at 354 (finding a violation of due process when, *inter alia*, months of "virulent

publicity" had "made the case notorious," including the defendant's examination before a crowd

20

of hundreds in a televised coroner's inquest that ended with a "public brawl"); *Press-Enterprise Co. v. Superior Court* (*Press-Enterprise II*), 478 U.S. 1, 8 (1986) (noting that "town meeting"-style trials risk creating a "'lynch mob' ambience [that] is hardly conducive to calm, reasoned decision-making based on evidence").

The unique nature of social networks on the Internet, moreover, exponentially increases these risks, by providing "cyber mobs" with unprecedented opportunities to reach straight into the same devices and online media the Jurors—like all of us—use for everything from grocery shopping to managing their medical care to sharing pictures of their children.[10]  The bad actors can then use this access to harass, to threaten, and to cause significant harm to victims' livelihoods and well-being.  The examples are legion.[11]

---

[10] The Supreme Court has long made decisions to protect personal privacy in the face of new technologies, the role of the new technology in society, and the corresponding changes in public expectations affecting individual privacy and security.  *See, e.g.*, *Riley v. California*, 573 U.S. 373, 385–86 (2014) (noting that mobile phones "are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy" while holding that the search-incident-to-arrest doctrine is inapplicable to cell phones that "place vast quantities of personal information literally in the hands of individuals"); *see also Carpenter v. United States*, 138 S. Ct. 2206 (2018) (holding that the Fourth Amendment protects an individual's privacy in historical cell site location information); *Kyllo v. United States*, 533 U.S. 27, 33–34 (2001) (holding that use of a thermal imager constituted a search and that it "would be foolish to contend that the degree of privacy secured to citizens by the Fourth Amendment has been entirely unaffected by the advance of technology"); *Katz v. United States*, 389 U.S. 347 (1967) (holding that use of a wiretap on a public phone booth intruded on a reasonable expectation of privacy notwithstanding the traditional third-party doctrine); *cf. Ontario v. Quon*, 560 U.S. 746, 759 (2010) (cautioning that privacy implications of "emerging technology" turn on "its role in society . . . becom[ing] clear"); *United States v. Jones,* 565 U.S. 400, 427 (2012) (Alito, J., concurring in judgment) (noting that "[t]he *Katz* test rests on the assumption that this hypothetical reasonable person has a well-developed and stable set of privacy expectations. But technology can change those expectations. Dramatic technological change may lead to periods in which popular expectations are in flux and may ultimately produce significant changes in popular attitudes").

[11] *See, e.g.,* Harmon Leon, *How Internet Mob Justice Can Easily Destroy Innocent Lives*, The Observer, May 31, 2019, https://observer.com/2019/05/internet-mob-justice-innocent-lives/ (collecting examples); *see also* Aja Romano, *What We Still Haven't Learned from Gamergate*, Vox, Jan. 20, 2020, https://www.vox.com/culture/2020/1/20/20808875/gamergate-lessons-

Given the foregoing, there can be little question that the facts present here support findings that continued protection of the questionnaires is necessary to protect the Jurors' privacy and security interests. Indeed, when the Court considered virtually the same question *only two months ago*, it concluded as much. As described in detail *supra*, at 12–13, when the Court partially closed a hearing on Mr. Stone's second new trial motion, it found that this is a widely publicized case, that "the particular issues related to the composition of the jury have also been widely publicized," and that numerous commentators have taken advantage to publish repeatedly "incendiary and false information" about the composition and selection of the *Stone* jury. *Stone* ECF No. 346 (2/25/20 Tr.) at 9–12. The Court further found that that "the risk of harassment and intimidation" of any Juror who is identified in the media is "extremely high and that individuals who may be angry about Mr. Stone's conviction or other developments in the news may choose to take it out on them personally." *Id.* at 11. In other words, for the Jurors, anonymity *is* safety. There is no basis to find otherwise now.

---

cultural-impact-changes-harassment-laws (collecting examples, arguing that business and law enforcement have been slow to learn how to handle bad-faith mass action online); Matt Shapiro, *Conservatives Need More Than Courage*, The National Review, Aug. 28, 2019, https://www.nationalreview.com/2019/08/conservatives-need-more-than-courage/ (discussing ubiquity of mass pressure campaigns targeted at procuring the termination of conservative corporate employees); Zoe Quinn, *What It's like to Be Targeted by an Online Mob*, KQED, Jan. 30, 2018, https://www.kqed.org/futureofyou/438097/what-its-like-for-a-woman-to-be-targeted-by-an-online-mob (systematic, years-long, campaign of harassment and threats against independent videogame developer based on disparaging post by ex-boyfriend); Cecilia Kang & Adam Goldman, *In Washington Pizzeria Attack, Fake News Brought Real Guns*, N.Y. Times, Dec. 5, 2016, https://www.nytimes.com/2016/12/05/business/media/comet-ping-pong-pizza-shooting-fake-news-consequences.html (active shooter incident based on mass hoax accusing Bill and Hillary Clinton of operating a pedophiliac human trafficking ring out of a Northwest Washington, DC, pizza shop).

**B.     The Jurors Are Affirmatively Requesting that the Questionnaires Remain Sealed Because They Believe that Continued Protection of the Questionnaires Is Necessary to Safeguard Their Privacy and Security.**

The second prong of *CNN* and *Press-Enterprise I* requires the Jurors to make an "affirmative request" for privacy protection.  As no party or *amicus* denies, such a request has plainly been made here.

It does not require guesswork or speculation to see that the Jurors would face unreasonable infringements of their privacy and security if the Court's protections were relaxed.  Certain jurors have been subjected to harassment already, and there is every reason to believe that others likely will as well, unless their questionnaires remain private.  *See attached* Citron Decl. ¶ 7.  To that end, the Jurors have provided declarations describing the factual basis for their pervasive fears of harassment and abuse.  *See attached* Jurors A–L Decls.  These declarations describe risks not only to their own personal safety, but also to the safety of their family members—many of whom can be easily identified based on information disclosed in their questionnaires.  Jurors—including some who are federal employees, and work with or are supervised by political appointees, or who work for organizations that depend on federal funding—also have justifiable fears that online harassment would threaten their employment and hard-earned professional reputations.

Given these risks, there can be no question that the Jurors want their questionnaires kept private post-verdict, and have affirmatively sought that protection from the earliest opportunity.  Indeed, as noted *supra*, at 10–11, the Jurors made that request directly of the Court shortly after trial.  And having been afforded a formal opportunity to be heard through counsel, they make it again here.  No more can reasonably be required to satisfy the second prong of *CNN* and *Press-Enterprise I.*

**C.      There Is No Alternative Means Available to Protect the Jurors' Privacy and Security.**

The final prong of *CNN* and *Press-Enterprise I* asks whether there are "alternative" means of protecting the Jurors' interests without sealing all or part of the trial.  Compelling evidence in the record makes clear that the answer to this is no.  The questionnaires must remain sealed in full.

As explained above, the Jurors' safety depends on their anonymity.  Their anonymity, in turn, depends on the Court's withholding public access to the questionnaires *in any form*.  As Professor Citron explains, "[c]onsiderable academic scholarship, regulatory requirements and practical guidance has addressed the subject of the ease of personal re-identification of individuals based on a relatively small number of data points."  *Attached* Citron Decl. at ¶ 7.f; *see also generally* Gina Kolata, *Your Data Were 'Anonymized'? These Scientists Can Still Identify You*, N.Y. Times, July 23, 2019, https://www.nytimes.com/2019/07/23/health/data-privacy-protection.html.

In fact, redacted jury questionnaires would be a uniquely attractive target.  "[T]he intimate—and the quotidian—details of the [J]urors' lives that are contained in the questionnaires would easily provide more than enough information for layperson[s] . . . to re-identify the [J]urors—all of whom live in the District of Columbia—without the need to involve any complex data science."  *Attached* Citron Decl. at ¶ 7.g.  Professor Citron's conclusion is straightforward: it is not "reasonably possible to protect the [J]uror's privacy and identity by merely removing the obviously identifying information," such as name, address, and place of work, "from publicly released versions of the questionnaires."  *Id.* at ¶ 7.f.  Or, in other words, "the disclosure of jury questionnaires containing particularly significant and highly personal elements of the [J]urors' life stories would not be realistically consistent with protecting [their] anonymity."  *Id.* at ¶ 7.g.

The Government and *amici*'s proposed resolutions of this case short-change these re-identification concerns.  The Government recommends that the questionnaires be stripped of information "which could be used to readily identify a juror." Govt. Br. at 4–5.  The Government, however, does not explain from where it draws this "readily identifiable" standard, and points to no case law endorsing it.  This is unsurprising.  Jurors are entitled to more than Potemkin privacy—the appearance of protection that falls away when put to a real test.  As Professor Citron opines, "the intense motivations and capabilities of cyber-mobs [would enable them to re-identify jurors] . . . even if the Court made an effort to remove the readily identifying details."  *Attached* Citron Decl. ¶ 7.g.  Given the harms that could befall the Jurors if their identities become publicly known—harms that this court has already recognized, *Stone* ECF No. 346 (2/25/20 Tr.) at 11:16–12:2; 16:4–11—the risk that redacted questionnaires could enable re-identification is simply too high to impose on the Jurors.  The information sought by Petitioner and the "privacy protected information is so intertwined that meaningful redaction is unavailable."  *Bruno*, 700 F. Supp. 2d at 185 n.9.

*Amici*'s position is even less tenable. *Amici* appear to argue that redactions should be permitted only for matters that are either "deeply personal" or that bear directly on each Juror's safety.  *See* Reporters Comm. Br. at 10–11.  In other words, *amici*'s redaction theory would do nothing to protect the Jurors' identities (though the omission of "deeply personal" material might soften the damage to their dignity).  Simply stated, both the Government's and *amici*'s proposals create an essentially inescapable risk that the release of questionnaires, even in redacted form, would lead to "some, many or all" of the Jurors being identified.  *See attached* Citron Decl. at ¶ 7.h.  These are no "alternatives" at all.

25

**III.    Petitioner Has Not Shown that His General Interest in Obtaining Additional Information Overcomes the Jurors' Continued Privacy and Security Interests or Requires Reversing the Court's Tailored Juror Protections.**

Petitioner, the Government, and *amici* all agree that there is a presumption in favor of public access to *voir dire* and juror identities. *See* Petition at 6–7; Govt. Br. at 2; Reporters Comm. Br. at 11 n.5.  That is surely correct.  And in the ordinary case, there will be no inconsistency between unfettered public access to juror information and jurors' ability to "inconspicuously fade back into the community once their tenure is completed." *Scarfo*, 850 F.2d at 1023.

But there has never been an "absolute right of access." *United States v. Blagojevich* (*Blagojevich III*), 743 F. Supp. 2d 794, 800 (N.D. Ill. 2010); see also Reporters Committee For Freedom of the Press, *The Right of Access to Juror Names and Addresses*, *available at* https://www.rcfp.org/journals/news-media-and-law-summer-2016/right-access-juror-names-an/ ("Although strong, the First Amendment right of access is not absolute").  The Supreme Court "has made clear that the right to an open trial may give way in certain cases to other rights or interests," *Waller,* 467 U.S. at 45, and "no one contends (or should contend) that jurors' names *always* must be released," *Blagojevich I*, 612 F.3d at 561.

Here, no one objected to the modest protective measure at issue before or during the trial, and, as laid out in detail above, *see supra* at 7–13, the Court took numerous steps to ensure copious press access to the proceedings.  These steps facilitated extensive print, television, and Internet coverage, which continues to this very day.

But it is only now that Petitioner and *amici* claim that release of the juror questionnaires is necessary for the press and the public to act as "a check on the fair functioning of the criminal justice system." Reporters Comm. Br. at 12 (quoting *In re Jury Questionnaires*, 37 A.3d 879, 889 (D.C. 2012)); Petition at 6.  The Jurors do not deny the validity of that interest, or that the Court is required—"even after the verdict is in"—to balance it carefully against the Jurors' interest in

26

privacy.  Reporters Comm. Br. at 12 (quoting *In re Jury Questionnaires*, 37 A.3d at 889).  The fact

of the matter, however, is that the case for anonymity has only grown stronger post-trial; and the

balance of equities tips even more clearly in favor of the Jurors' now than during the long period

when the juror protections were in place without objection.

> **A.      The Exceptional Threats to the Jurors' Privacy and Security Have Not
> Diminished Since Trial's End.**

The Court's "power to prevent harassment and protect juror privacy does not cease when

the case ends." *United States v. Brown*, 250 F.3d 907, 918–19 (5th Cir. 2001).  In other words,

even though the jury's verdict extinguished the instrumental interest in securing the integrity of

deliberations in this particular case, powerful reasons remain to preserve juror anonymity where

doing so is necessary to prevent harassment and other threats. And that is the case here.

The Fifth Circuit's decision in *Brown* is a case in point.  Like this dispute, *Brown* arose out

of the politically charged trial of a colorful figure—the former Governor of Louisiana—accused

of corrupt interference with official proceedings.   *Id.* at 916 ("This particular prosecution

involved . . . attempted bribery of a judge, attempting illegally to terminate a federal investigation,

and influencing a court-appointed special master.").  An anonymous jury was empaneled at the

Government's request, with jury selection conducted in part through "questionnaires [that] assured

the jurors that all information would remain confidential."  *Id.* at 912.  After a guilty verdict,

various media organizations intervened seeking access to the jurors' names, addresses, places of

employment, and questionnaires.  *Id.*  The district court denied the request.  *Id.*

On appeal, the Fifth Circuit affirmed.  At the outset, it noted that the grant of post-verdict

anonymity "must be placed in context.  It rests on an earlier promise of anonymity, which itself

was grounded in well-documented threats by the media and the defendants to jurors' privacy and

independence.  the drumbeat of publicity surrounding the [Governor's] prosecutions continues to

this day." *Id.* at 919–20.  The court further emphasized that, unlike in some prior cases, there was no prohibition on interviewing jurors who decided they wanted to speak publicly, and jurors could consent to their questionnaires being released if they wished.  The order, in other words, was "narrowly tailored to prevent [the] real threats to the administration of justice" posed by post-verdict juror harassment and invasions of privacy.  *Id*. at 921.

The court likewise rejected the media's argument that juror anonymity, as a matter of law, "should have ceased when the trial ended."  *Id.*  It explained that, "[n]o caselaw requires this result, and the question appears closely tied to the rationale for initially convening an anonymous jury, an order [the media] did not appeal.  Threats of intimidation and harassment do not necessarily end with the conclusion of trial."  *Id.*  It continued, in terms that unmistakably parallel this case, that anonymity was particularly important because "several post-verdict motions have assailed jurors' conduct; without continuing anonymity, jurors would remain vulnerable to abuse by those acting for the defendants."  *Id.* at 921–22.

This case is plainly on all fours with *Brown*, and other courts have indicated that they would apply the same logic.  *See, e.g.*, *Press-Enterprise I*, 464 U.S. at 511–12 (noting that "[w]hen limited closure [of *voir dire*] is ordered, the constitutional values . . . may be satisfied later by making a transcript of the closed proceedings available . . . , if the judge determines that disclosure can be accomplished while safeguarding the juror's valid privacy interests.  Even then a valid privacy right may rise to a level that part of the transcript should be sealed . . . ."); *Globe Newspaper Co. v. Hurley*, 920 F.2d 88, 91 (1st Cir. 1990) ("[T]here could be circumstances necessitating withholding of juror identities after verdict . . . .  Failure of the court to shield jurors from threatened harm could seriously damage the functioning of the courts and the jury system.  Were jurors to feel that their personal safety was at risk, they might not only be reluctant to serve but

might tailor verdicts so as to forestall harm to themselves, thus depriving the parties of an impartial jury."); *Bruno*, 700 F. Supp. 2d at 184–85 & n.9 (denying motion for press access to jury questionnaires during deliberations on grounds that jurors had disclosed "extraordinarily personal and sensitive" information, court had assured jurors of confidentiality, and disclosure would potentially make the jury "the subject of relentless public scrutiny simply because they honored their constitutional duty" in a trial surrounded by a highly charged "emotional and political climate").

Here, just like in *Brown*, the Jurors have relied on an "earlier promise of anonymity, which itself was grounded in well-documented threats by the media and the defendants to jurors' privacy and independence." *See* 250 F.3d at 919–20. Here, just like in *Brown*, the "drumbeat of publicity . . . continues to this day." *See id.* Here, just like in *Brown*, the Jurors can consent to their identities being made public, as two Jurors already have. And, here, just like in *Brown*, "without continuing anonymity, [the] [J]urors would remain vulnerable to abuse by those acting for the defendants." *See id.* at 921–22. This Court should thus, just as the *Brown* court did, reject the request to reverse the juror protections.

Indeed, the interest in protecting the Jurors from harassment and other threats that animates *Brown* is not the only interest that supports continuing the Jurors' anonymity post-verdict. As noted above, the Jurors have an independent interest in preserving the privacy of information that "deserve[s] protection because it is extraordinarily personal and sensitive"—an interest that the declaration each Juror submitted to this Court makes clear. *See Bruno*, 700 F. Supp. 2d at 185 & n.9 (denying motion for press access to questionnaires, holding that "disclosures includ[ing] information about divorce, living arrangements with significant others, unemployment, union activity, personal financial investments, victimization, political activity, and personal views about

29

public officials" "deserve[d] protection" because they were "extraordinarily personal and sensitive," further denying release of redacted questionnaires because "the pre-screening and privacy protected information [was] so intertwined that meaningful redaction [was] unavailable"); *see also In re Washington Post*, 1992 WL 233354, at *2 (D.D.C. July 23, 1992) ("The court shall redact those portions of prospective jurors' answers which contain deeply personal and private information that the prospective jurors would wish to keep out of the public domain").

The interests of the legal system and the administration of justice are also served by protecting juror privacy.  As another district court has said:

> [R]eleasing the jurors' [information]"—after the jurors had relied on the Court's express pledges of confidentiality—"would undermine the ability of judges in the future to use anonymous juries to ensure fair trials . . . . It is not difficult to imagine a future juror reacting incredulously—perhaps with good reason—to a judge's promise of anonymity if it becomes clear that it is merely a fleeting promise, revocable upon the conclusion of the trial. In order to ensure that judges are able to use anonymous juries to promote fairness, anonymity must not be illusory. It is essential that jurors have confidence in a judge's promise of anonymity.

*United States v. Calabrese*, 515 F. Supp. 2d 880, 885 (N.D. Ill. 2007); *see also Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 222 (1979) (noting that, in considering the effects of a disclosure of grand jury transcripts, "courts must consider not only the immediate effects upon a particular grand jury, but also the possible effect upon the functioning of future grand juries," as those "called upon to testify will consider the likelihood that their testimony may one day be disclosed to outside parties"); *Blagojevich I*, 612 F.3d at 562 (labeling as a "legitimate interest[]" the fear that "public knowledge of the jurors' identities . . . would discourage others from agreeing to serve in future trials").  The end of the *Stone* trial did not diminish either of these interests. Jurors' interest in privacy is manifestly at least as strong as when they were first empaneled.

*Amici* are thus simply wrong to suggest that the fact that two jurors have made public statements "substantially weaken[] any argument for continued secrecy."  *See* Reporters Comm.

30

Br. at 12.  In fact, *amici* have it precisely backwards, at least with respect to the other Jurors.  The decision of the two Jurors who have spoken publicly was theirs alone, and cannot be imputed to the other members of the panel who have chosen to remain anonymous.  And the significant harassment and threatening communications the two publicly-acknowledged Jurors were forced to suffer after disclosing their involvement in the trial hardly "weaken[s]" the remaining Jurors' argument for privacy.  To the contrary, it greatly strengthens it.

Moreover, *amici*'s suggestion ignores the fact that the two Jurors who spoke publicly retain a substantial interest in maintaining the secrecy of their questionnaires, which contain significant intimate information about them and their associates.  Their questionnaires, for example, identify friends and relatives by name, with additional information ranging from employment histories to criminal backgrounds.  Disclosing one's involvement in the case in no way constitutes implicit consent to the release of information the Jurors had every reason to believe would remain confidential.  As this Court has already found, "given the extraordinary events that have transpired since [the two jurors spoke publically] . . . and the number and derogatory and intimidating nature of the statements that have been published about them since then . . . it is incumbent upon the Court to ensure that neither it nor the parties . . . disseminate the information further."  *Stone* ECF No. 346 (2/25/20 Tr.) at 17:21–18:4.

   **B.     In Contrast, the Trial's End Weakens Petitioner's Interest in Accessing the Questionnaires, Particularly Because Alternate Proceedings Are Fully Evaluating Potential Juror Bias.**

As the Supreme Court has recognized, the "significant community therapeutic value" of press coverage is plainly at its height during the trial itself.  *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 570 (1980).  Post-verdict, it is "too late" to salvage the trial by seating alternate jurors, or to save resources by declaring an early mistrial.  *See Blagojevich I*, 612 F.3d at

562. Given this, "[t]he value of any right of access . . . can only be diminished after trial has begun, and diminished even further once a verdict has been rendered." *Wecht*, 537 F.3d at 239.

This is particularly true where, as here, there is no danger that the primary interest identified in Petitioner's motion—the risk of alleged jury bias—will go unscrutinized.  Mr. Stone has filed a pair of new trial motions on exactly that ground, one of which is still pending before the Court after a public evidentiary hearing.  Counsel for Mr. Stone—undoubtedly the actors most motivated to examine the Jurors for any indicators of undisclosed bias—have full access to the questionnaires during that proceeding, and they will undoubtedly draw on them as relevant to their client's bias claims.  Put simply, the issue before this Court is not whether Roger Stone received a fair trial, but rather, whether Petitioner is entitled to the contents of the questionnaires.

For the reasons laid out above, he is not.

## CONCLUSION

The Court should deny the Petition.

Date:  April 15, 2020

Respectfully submitted,

*/s/ Alan Raul*
Alan Charles Raul
Bar ID 362605
Michele L. Aronson
Gabriel Schonfeld
SIDLEY AUSTIN LLP[*]
1501 K Street, N.W.
Washington, D.C. 20005
Tel: (202) 736-8477
Fax: (202) 736-8711
araul@sidley.com

---

[*] Jurors' Counsel also wishes to acknowledge the invaluable contributions of Laura Sorice, Associate in the New York office of Sidley Austin LLP, whose swearing-in as a member of the Bar of the State of New York is delayed in light of the present public health emergency.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on April 15, 2020, I served upon all counsel of record the foregoing Brief, the Declaration of Danielle K. Citron with exhibits, and the Declarations of Jurors A–L with exhibits, by filing said documents using the Court's Electronic Case Filing System.

Date:  April 15, 2020                                      /s/ *Alan Raul*_____
                                                                          Alan Charles Raul